Kendell A. SNOWDEN, Appellant,

v.

UNITED STATES, Appellee.

No. 09–CF–1455.

District of Columbia Court of Appeals.

Argued Jan. 26, 2011.

Decided Sept. 20, 2012.

Christopher R. Pudelski, appointed by this court, for appellant.

Jonathan P. Hooks, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, and Elizabeth Trosman and Bryan Seeley, Assistant United States Attorneys, were on the brief, for appellee.

Before FISHER, Associate Judge, and PRYOR and RUIZ,* Senior Judges.

* Judge Ruiz was an Associate Judge of the court at the time of argument. Her status changed to Senior Judge on July 2, 2012.

RUIZ, Senior Judge:

Appellant was convicted in Superior Court of several offenses related to an armed robbery of a group of individuals: one count of conspiracy to commit armed robbery,[1] one count of armed robbery,[2] four counts of assault with intent to rob while armed (AWIRWA),[3] one count of aggravated assault while armed (AAWA),[4] and two counts of possession of a firearm during a crime of violence (PFCV).[5] On appeal, he challenges the sufficiency of the evidence to support the convictions, on a conspiracy theory, for aggravated assault while armed and assault with intent to rob while armed, and claims that the eyewitness's identification was so unreliable that it would not permit a finding of guilt beyond a reasonable doubt. Appellant also makes two merger arguments, asserting that the four convictions for assault with intent to rob while armed merge into one, and that the two PFCV convictions merge with the underlying convictions for armed robbery and aggravated assault while armed. We discuss each contention in turn, and, concluding that none warrants reversal, affirm appellant's convictions.

## I. Facts

*The Government's Evidence*

The charges against appellant stemmed from a robbery and shooting on the evening of May 2, 2008, on the 4900 block of Jay Street, Northeast. That evening Lorenzo Ross ("Lorenzo"), his father, Lorenzo Ross, Sr., and his cousins, Derrick Ross, DeAngelo Martino, and Martin Scales, were "hanging by the dumpster in the parking lot" of Lorenzo's apartment complex, celebrating Lorenzo Ross, Sr.'s recent release from prison. At some point during the celebration, Lorenzo saw a girl he knew from the complex, Shaelin Rush, and he left the group to talk with her privately. While Lorenzo and Shaelin were talking, they saw a group of five "boys" in the vicinity. Lorenzo saw Shaelin approach the boys, hug them, and then go inside a nearby apartment building. The boys were around the corner from Lorenzo's father and cousins, and neither group could see the other's location, though Lorenzo could see both groups.

Lorenzo recognized one of the boys as appellant because he was standing "right underneath" a lamp post. Lorenzo knew appellant because they rode the bus together to school every day, and that appellant went by the name of "Snoop," something Lorenzo learned when appellant had interrupted his neighborhood basketball game a few weeks earlier because Snoop thought someone had "said something to [his] little brother." At that time, Lorenzo saw that appellant had a tattoo on his arm that read "Rest in peace, Cheese." [6][7]

Lorenzo testified that after Shaelin went inside, he saw appellant put on a black ski mask and heard him say to the other boys, "y'all ready, let's go." As the group of boys began to move toward Lorenzo's father and cousins, Lorenzo started toward the dumpster to warn his family that he had a "bad feeling" about the boys. Just as Lorenzo got to the dumpster, however, appellant came around the corner with a

1. D.C.Code § 22–1805(a) (2001).

2. D.C.Code §§ 22–2801, –4502 (2001).

3. D.C.Code §§ 22–401, –4502 (2001).

4. D.C.Code §§ 22–404.01, –4502 (2001).

5. D.C.Code § 22–4504(b) (2001).

6. Appellant stipulated at trial that he had tattoos on his arm that read, "Rest in peace, Cheese" and "Snoop."

7. Lorenzo testified that "a lot of people in the neighborhood" have "Rest in peace, [C]heese" tattoos.

gun. As appellant rounded the corner and approached the group, Scales was on a cellular phone walking away from the group and, unknowingly, toward appellant. Lorenzo testified that upon rounding the corner appellant said, "give that shit up." Scales testified that appellant said, "you know what it is, let me get that." A second gunman walked behind the group and positioned himself "to the point where [if] [Lorenzo and his group] want[ed] to run he had a perfect angle to shoot [them]." The second gunman, who had a bandana covering his face and wielded a "big handgun" similar to an Uzi, was aiming the gun at the group, "moving" the gun between "different people."

Appellant ordered Scales to "get on the gate," and then "patted [Scales's] pockets." Scales responded by giving appellant $20 that he had in his front pocket. Appellant poked the gun into Scales's side, attempted to search Scales's other pockets and "take [him] down to the dumpsters ... so he could do a thorough search." Scales reacted by grabbing the gun and trying "to get the gun away from [appellant] or to get away from him." Scales "was swinging [at appellant] trying to hit him with everything [he] had, hoping [appellant] would drop the gun." Scales shouted for the rest of his group to flee; as Lorenzo and the others ran, the second gunman did not attempt to stop them. Scales and appellant fell to the ground fighting and the gun fired. Lorenzo testified that after he heard the gun discharge, he looked back and saw "them still fighting ... wrestling." Scales tussled with appellant for "a long time," while the second gunman stood about twenty feet away with his gun directed toward Scales. Appellant eventually wrestled free of Scales and took off running with his gun.

After appellant fled, the second gunman kept his gun trained on Scales. Scales raised his arms in submission and told the gunman "you got all of the money that I have." From the porch of a nearby house, Lanette Ross (Lorenzo's mother) and her sister said, "call the police," and yelled at the gunman, "don't shoot him." The gunman paused, raised and lowered his gun three times, and then shot Scales in the right-side of his abdomen.[8] Scales "dropped to [his] knees" in "awful pain." MPD officers arrived at the scene a short time later, and Lorenzo reported to them that "Snoop" had committed the armed robbery. On May 6, 2008, Lorenzo identified appellant in a 9–person photographic array, and on May 9, 2008, he testified before the grand jury that appellant was the armed robber.

MPD Officer Ronald Royster testified that he searched the scene of the shooting and retrieved one spent 9 mm shell casing, several unspent .40 caliber cartridges, and the "guide," and "butt plate" of the magazine of a semi-automatic weapon. MPD Officer David Murray testified that he was unable to obtain any fingerprint evidence from the weapon "cartridges ... [and] cartridge case." The government also called MPD Detective Thurman Stallings, who testified that Lorenzo had identified the robber as "Snoop" during an interview shortly after the robbery occurred and did not "show any hesitation" doing so again when the photographic array was presented on May 6, 2008. Detective Stallings prepared the warrant for appellant's arrest after Lorenzo identified appellant a third time on May 9, 2008, when they spoke prior to Lorenzo's grand jury testimony.

*The Defense's Evidence*

The defense called one witness: Shaelin Rush. She testified that she had played

---

8. Lorenzo testified that he "hear[d] two more gunshots" as he was running away through the parking lot.

basketball with appellant on the evening of the robbery until about 8:30 p.m., and he was wearing "a red shirt . . . and blue . . . long jeans." Shaelin said that when she saw him five minutes later and gave him a hug, he was still wearing the same .clothing. She thought he then went "back on the basketball court," but she did not actually see him "go back there." Shaelin testified that she then left the basketball court and was on her way to a friend's house "at around 9:30 p.m." when she saw another friend, Kevin, who was appellant's "close friend." She hugged Kevin, and after talking to him for a minute, began to leave and walked past a "group of boys . . . [wearing] all black" whom she did not know. She did "not know" whether the group was with Kevin, but "when [she] left the area [she] saw them go in the same direction" as Kevin. Once Shaelin got to her friend's house nearby, she said that she immediately "began hearing gunshots." She testified that she never saw Lorenzo that evening. Shaelin testified both on direct and cross-examination that she did not want to testify in this case.

The jury found appellant guilty of conspiracy to commit armed robbery; AAWA and armed robbery, as to Scales; four counts of AWIRWA, as to Lorenzo, Lorenzo Ross, Sr., Derrick Ross, and Martino; and seven counts of PFCV—one for each of the seven armed predicate offenses. The jury found appellant not guilty of assault with intent to kill while armed [9] as to Scales, but found him guilty of the lesser-included offense of assault with a dangerous weapon (ADW).[10] The jury also acquitted appellant of carrying a pistol without a license.[11] The court dismissed appellant's ADW conviction,

merged five of his seven PFCV convictions, and sentenced appellant to a total of 120 months of incarceration, three years of supervised probation, and a $900 fine to be paid to the Victims of Violent Crimes Compensation Fund. Appellant filed a timely notice of appeal.

## II. Sufficiency of the Evidence of Co-Conspirator Liability for AAWA

There was no evidence that appellant shot Scales; indeed, the evidence showed that appellant had fled with the $20 before the second gunman fired the shot. The government's theory of Scales's liability for AAWA was that the shooting was in furtherance of the conspiracy of which appellant was a part.

In *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), the Supreme Court held that a defendant may be liable for the acts of his co-conspirator. *Id.* at 646–47, 66 S.Ct. 1180. Thus, "a co-conspirator who does not directly commit a substantive offense may [nevertheless] be held liable for that offense if it was committed by another co-conspirator in furtherance of the conspiracy and was a reasonably foreseeable consequence of the conspiratorial agreement." *Wilson–Bey v. United States*, 903 A.2d 818, 840 (D.C. 2006) (en banc) (alteration in original) (quoting *Gordon v. United States*, 783 A.2d 575, 582 (D.C.2001)). " 'The government is not . . . required to establish that the co-conspirator actually aided the perpetrator in the commission of the substantive crime, but only that the crime was committed in furtherance of the conspiracy.' " *Gatlin v. United States*, 925 A.2d 594, 599 (D.C. 2007) (quoting *Wilson–Bey*, 903 A.2d at 840).[12] Appellant argues that his conviction of AAWA must be vacated "because

9. D.C.Code § 22–404.01, –4502 (2001).

10. D.C.Code §§ 22–402 (2001).

11. D.C.Code § 22–4504(a) (2001).

12. The jury was instructed on the elements of conspiracy and co-conspirator liability. The trial court later re-read the conspiracy liability instructions to the jury in response to a

the evidence was insufficient to prove beyond a reasonable doubt that the aggravated assault of Mr. Scales [by the second gunman] was (1) in furtherance of the conspiracy or (2) a reasonably foreseeable consequence of it." Rather, he argues, what the evidence supports is that the shooting of Scales was a "random act of violence" by the second gunman for which appellant is not criminally responsible.[13] We conclude that the evidence sufficed to permit the jury to find appellant guilty of AAWA under a *Pinkerton* theory of co-conspirator liability.[14]

### 1. "In Furtherance of" the Conspiracy

◼ Appellant contends that there was no evidence that the second gunman's shooting of Scales was necessary to accomplish the objective of the conspiracy—robbery—as appellant had seized the money and run away with it, thus completing the robbery, by the time the shooting occurred. The government counters that the shooting was in furtherance of the conspiracy because it "occurred before all the culprits had escaped and it advanced the conspiracy's goals by assisting the escape and asportation of proceeds, protecting the robbers from Scales, punishing Scales'[s] resistance, and discouraging Scales and others from reporting the offense or testifying against the robbers." [15]

◼ We have not previously considered whether a shooting by one co-conspirator that takes place after another co-conspirator has fled may be deemed to be "in furtherance of" the conspiracy for purposes of co-conspirator liability. We have, however, applied related agency principles in the context of deciding whether a co-conspirator's statement made in similar circumstances is admissible under the hearsay exception for statements made by a co-conspirator.[16] *See (Brian) Williams*

juror note asking, "If we find the Defendant is guilty of conspiracy to commit armed robbery and we find that a co-conspirator committed one or more of the remaining charges, *e.g.*, armed robbery, AWIK while armed, do we then have to find the Defendant guilty of those charges by means of his involvement in the conspiracy? Or is it in our discretion to find him guilty of these crimes slash charges?" Appellant does not challenge the instruction or re-instruction.

13. Appellant does not argue that the evidence was otherwise insufficient to prove the elements of AAWA.

14. In evaluating the sufficiency of the evidence to support guilt on a conspiracy theory, we apply the well-known standard. "[W]e evaluate the sufficiency of the evidence 'in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact....'" *Moore v. United States*, 927 A.2d 1040, 1049 (D.C.2007) (quoting *Curry v. United States*, 520 A.2d 255, 263 (D.C.1987)). While this review is "deferential," it is not "toothless." *Rivas v. United States*, 783 A.2d 125, 134 (D.C.2001) (en banc) ("We have an obligation to take serious-

ly the requirement that the evidence in a criminal prosecution must be strong enough that a jury behaving rationally really could find it persuasive beyond a reasonable doubt."). However, this court will reverse a conviction for insufficiency of the evidence only if the "government has produced no evidence from which a reasonable mind might fairly infer guilt beyond a reasonable doubt." *Anderson v. United States*, 857 A.2d 451, 463 (D.C.2004) (quoting *Zanders v. United States*, 678 A.2d 556, 563 (D.C.1996)).

15. The government argues that appellant has waived this argument because his trial counsel mentioned during closing argument that "Scales was shot *during* the robbery." (Emphasis added.) Counsel's statement does not have the evidentiary force of a stipulation, however, nor does it invalidate appellant's motion for judgment of acquittal, which preserved the claim of insufficiency for appeal.

16. Under Federal Rule of Evidence 801(d)(2)(E), which we have adopted, to be admissible, a co-conspirator's out-of-court statement must have been made "during the course of and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E). Once it has

*v. United States*, 655 A.2d 310, 313–15 (D.C.1995) (holding that the trial court did not abuse discretion in admitting co-conspirator's statement made during the division of the spoils, shortly after the robbery). In *Williams*, we cited a case from the Maryland Court of Appeals explaining that

> [c]onspirators do not necessarily achieve their chief aim at the precise moment when every element of a substantive offense has occurred.... Before the conspirators can be said to have successfully attained their main object, they often must take additional steps, *e.g.*, fleeing, or disposing of the fruits and instrumentalities of crime. Such acts further the conspiracy by assisting the conspirators in realizing the benefits from the offense which they agreed to commit.

*State v. Rivenbark*, 311 Md. 147, 533 A.2d 271, 276 (1987). This rationale applies here as well. Insofar as the objective of appellant and his co-conspirators was to rob Scales, their goal was not completed until they had successfully made off with the fruits of their criminal endeavor. *Cf. Castillo–Campos v. United States*, 987 A.2d 476, 491 (D.C.2010) ("[S]o long as the essential ingredient of asportation continues, the crime of robbery is still in progress ....") (quoting *Carter v. United States*, 223 F.2d 332, 334 (D.C.Cir.1955)); *see also Commonwealth v. Smith*, 511 Pa. 343, 513 A.2d 1371, 1375 (1986) ("Flight from the crime scene and division of the

robbery proceeds were certainly parts of a common design to carry out the robbery, and, thus, the statements in question were properly admitted as having been made in the course of carrying out the design of the conspiracy.").

Although *Pinkerton* co-conspirator liability and accomplice liability are "distinct legal theories that require proof of different elements," *Tyree v. United States*, 942 A.2d 629, 636 n. 2 (D.C.2008) (quoting *Wilson–Bey*, 903 A.2d at 839), we see no meaningful distinction between these theories of liability for the purpose of assessing whether the evidence supports that another's actions were committed "in furtherance of" a criminal enterprise.[17] In the context of felony murder, where there must have been "*some* causal connection between the homicide and the underlying felony," we have found evidence to be sufficient to hold an accomplice liable for a killing committed by another in furtherance of a burglary where "the killing can be said to have occurred *as a part of the perpetration of the crime.*" *Lee v. United States*, 699 A.2d 373, 385 (D.C.1997) (quoting *(Charles) Johnson v. United States*, 671 A.2d 428, 433 (D.C.1995), and *United States v. Heinlein*, 490 F.2d 725, 736 (D.C.Cir.1973)). In *Lee*, we held that "a reasonable jury could have found that the shootings were a means of facilitating the successful completion of the armed burglary, and that the burglary and the killings were 'all part of one continuous chain of events.'" *Id.* at 386 (quoting *West v. Unit-*

been determined that a statement is made "in the course" of the conspiracy, the test for whether the statement was "in furtherance of" the conspiracy is not an onerous one. *(Brian) Williams*, 655 A.2d at 313.

**17.** If anything, aiding and abetting liability requires more: knowing participation by the accomplice in "something he wished to bring about," whereas once a conspiracy is established, co-conspirators are liable under an

agency theory for each other's actions in furtherance of the conspiracy. *Wilson–Bey*, 903 A.2d at 840 (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir.1938)) (noting that unlike under aiding and abetting theory of liability, for conspiracy liability, "[t]he government is not required to establish that the co-conspirator actually aided the perpetrator in the commission of the crime, but only that the crime was committed in furtherance of the conspiracy").

*ed States,* 499 A.2d 860, 866 (D.C.1985)). *See (Charles) Johnson,* 671 A.2d at 436 n. 10 (upholding conviction for felony-murder and rejecting argument that "the robbery had ended as a matter of law before the police pursuit began" because "the jury readily could find that the asportation phase of the robbery was continuing at the time of the fatal accident"). What is important is not simply that the killing occurred *during* the actual commission of the predicate crime, but that it aided in the completion of the crime. *See id.* at 433 (noting that "mere temporal and locational coincidence is not enough"); *cf. Carter,* 223 F.2d at 334 (noting that "the crime of robbery is still in progress; . . . [if] during continuous pursuit immediately organized and begun, asportation is still going on, with the result that the robber is guilty of first degree murder if in those circumstances he kills a pursuer"). A shooting by a co-conspirator that is similarly causally linked to completion of the object of the conspiracy is properly charged against other co-conspirators under a theory of conspiracy liability.

Viewing the evidence presented in appellant's trial in the light most favorable to the government, we conclude that it was sufficient to support a determination that the shooting was in furtherance of the conspiracy to commit armed robbery. As noted, the second gunman shot Scales as appellant was fleeing with the money he had taken from Scales. Because the shooting guaranteed a clean escape for the assailants with the proceeds of their crime, the shooting aided in the successful completion of their criminal endeavor. *See Rivenbark,* 533 A.2d at 276. Even if the second gunman appeared to hesitate, it

was not a disconnected act, as the shooting occurred at the scene of the robbery and only about fifteen seconds after appellant had broken free from Scales, such that the jury could reasonably find that the shooting and the robbery were "one continuous and unbroken chain of events," *Coleman v. U.S.,* 295 F.2d 555, 557 (D.C.Cir.1961), rather than a "random act of violence," as appellant contends.

### 2. "Reasonably Foreseeable" Consequence of the Conspiracy

■ Appellant also argues that the shooting was not a reasonably foreseeable consequence of the robbery because the objective of the conspiracy had already been completed and there was "some appreciable interval of time" between the robbery and the shooting. We disagree. As the government points out, a shooting is quite naturally a reasonably foreseeable consequence of an *armed* robbery.

In *Prophet v. United States,* we stated that "all parties are guilty for deviations from the common plan which are the foreseeable consequences of carrying out the plan (an accidental shooting during an armed robbery being a typical example of a foreseeable deviation from the plan to rob)." 602 A.2d 1087, 1095 n. 12 (D.C. 1992) (citing WAYNE LAFAVE & AUSTIN SCOTT, JR., HANDBOOK ON CRIMINAL LAW § 71, at 553 (1972)). Here, though the shooting was not accidental, we think that the circumstances present just such a "typical example." A defendant who conspires to commit an armed robbery should anticipate that a shooting may occur during the commission of the robbery and is held accountable if a shooting does, in fact, occur.[18] *Cf. Castillo–Campos,* 987 A.2d at

---

**18.** During closing argument, the prosecutor stated: "Why do you bring a real gun with real bullets to a robbery in case something goes wrong? That's part of the plan. That's part of the conspiracy. In case something goes wrong, you're going to either punish someone, or silence someone or do whatever it takes to get what you came to get. That's foreseeable."

482, 488 (holding evidence sufficient for the jury to convict defendants of AWIR-WA as co-conspirators because the shooting by another co-conspirator was a reasonably foreseeable consequence of the conspiracy to assault rival gang members where evidence showed multi-year armed attacks under a "kill or be killed" mentality). Appellant himself used a weapon to confront Scales and take his money. As we have discussed, the robbery was progressing even as appellant was fleeing the scene because the asportation of the proceeds was continuing at that time. *Id.* at 491. Moreover, appellant's argument about the timing of the shooting (that "some appreciable interval of time" elapsed between the time appellant took the money from Scales and the shooting) is irrelevant because our proper focus is on whether a shooting is reasonably foreseeable at *any* point during the commission of the armed robbery. His argument is also factually inaccurate. Once Scales decided to fight back, appellant's ability to keep the cash could not be assured until he was able to break free and run away.[19] The shooting took place only fifteen seconds later. Because appellant and at least one of his co-conspirators brought weapons to the scene of the robbery and both employed those weapons to effectuate the robbery, the jury could properly conclude that the shooting of Scales so soon after appellant fled was a reasonably foreseeable consequence of their conspiracy to commit armed robbery.

### 3. Implied Theory of Concealment

■ We reject appellant's contention that the prosecutor improperly argued "an implied theory of concealment" to show that the shooting was in furtherance of and a reasonably foreseeable consequence of the armed robbery. His contention, which rests on *Grunewald v. United States*, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), is that the prosecutor's closing argument—that Scales was shot to "silence" him—was improper because a conspiracy to conceal a crime cannot be implied from every conspiracy to commit a crime. We think that appellant reads the government's closing argument too literally. *Grunewald* explains that "after the central criminal purposes of a conspiracy have been attained, a subsidiary conspiracy to conceal may not be implied from circumstantial evidence showing merely that the conspiracy was kept a secret and that the conspirators took care to cover up their crime." 353 U.S. at 401–02, 77 S.Ct. 963; *see United States v. Turner*, 548 F.3d 1094, 1097 (D.C.Cir.2008). That is because such acts "indicate nothing more than the conspirators do not wish to be apprehended—a concomitant, certainly, of every crime since Cain attempted to conceal the murder of Abel from the Lord." *Grunewald*, 353 U.S. at 405–06, 77 S.Ct. 963. The prosecutor's closing argument was not implying that the shooting was a "subsidiary" conspiracy to conceal the armed robbery. Instead, the prosecutor argued to the jury that the shooting was in furtherance of the conspiracy to commit the armed robbery itself by ensuring that the perpetrators could get away. Indeed, as *Grunewald* counsels, "a vital distinction must be made between acts of concealment done in furtherance of the main criminal objectives of the conspiracy, and acts of concealment done after these central objectives have been attained, for the purpose only of covering up after the crime."

19. We are not persuaded by appellant's attempts to distinguish this case from the "typical" example where resistance from the victims of the crime can be anticipated, leading to the use of a weapon. Scales did resist and there is no evidence to suggest that appellant had any reason to believe that Scales or the others in the group by the dumpster would react passively to the robbery.

353 U.S. at 405, 77 S.Ct. 963. Even if we accept that the shooting was done to conceal—*i.e.*, to "silence" Scales—the temporal and spatial proximity of the shooting to appellant's robbery of Scales leaves little question that it was committed as part of the ongoing robbery, and not after the fact for the purpose of covering up the completed crime. *Cf. McCoy v. United States,* 760 A.2d 164, 180 (D.C.2000) (holding that statements made by co-conspirator two hours, two weeks, and two years after killing urging silence about the crime were not made in furtherance of the conspiracy for purposes of admissibility of a co-conspirator's statement (citing *Grunewald,* 353 U.S. at 402, 77 S.Ct. 963)).

We conclude that the evidence, taken in the light most favorable to the government, was sufficient for the jury to conclude that the second gunman's shooting of Scales was both in furtherance of the conspiracy to commit armed robbery and a reasonably foreseeable consequence thereof. We therefore affirm appellant's AAWA conviction.

### III. Sufficiency of the Evidence for AWIRWA

Appellant argues that his four convictions for assault with intent to commit robbery while armed of Lorenzo, Lorenzo Ross, Sr., Derrick Ross, and Martino—the four in the group with Scales by the dumpsters—"must be vacated because there was insufficient evidence that [appellant], as the alleged first gunman, assaulted or intended to rob members of the group by the dumpsters other than Scales." We agree with the government that there was sufficient evidence from which the jury could find both that appellant himself assaulted and intended to rob all the victims, and that the second gunman assaulted all the victims, an assault for which appellant is responsible as a co-conspirator.

To convict appellant of assault with intent to commit armed robbery, the government needed to prove that appellant committed an assault, that at the time of the assault, appellant acted with the specific intent to commit a robbery, and that appellant was armed. *See Singleton v. United States,* 488 A.2d 1365, 1367 n. 2 (D.C.1985). "An intent to commit robbery may be inferred not only from the words uttered by the suspect but also from his conduct or from the 'totality of the evidence.'" *Owens v. United States,* 497 A.2d 1086, 1090 (D.C.1985) (quoting *Dowtin v. United States,* 330 A.2d 749, 750 (D.C. 1975)). A defendant does not need to announce his intent. *Id.*

Viewed in the light most favorable to the government, the evidence was sufficient for the jury to convict appellant of assaulting the four individuals who were by the dumpster and that he did so with the intent to rob them. First, the evidence was sufficient to show that appellant and the second gunman assaulted the group under an intent-to-frighten theory.[20] An "intent-to-frighten assault ... requires proof that the defendant intended either to cause injury or to create apprehension in the victim by engaging in some threatening conduct; and actual battery need not be attempted." *Robinson v. United States,* 506 A.2d 572, 574 (D.C.1986). Intent to frighten may be inferred from the act of pointing a gun at a person. *Id.* at 575. Moreover, "[i]n addition to situations in which a gun is pointed at the victim, intent to frighten assault includes situations in which a weapon is used 'in any manner that would reasonably justify the other person in believing that the weapon might immediately be used against him.'" *Parks v. United States,* 627 A.2d 1, 7 (D.C. 1993) (quoting *Robinson,* 506 A.2d at 574). "'[T]he crucial inquiry [is] whether the

---

20. The government does not argue that there was evidence of an attempted-battery assault.

assailant acted in such a manner as would under the circumstances portend an immediate threat of danger to a person of reasonable sensibility.'" *Id.* (alteration in original) (quoting *Robinson,* 506 A.2d at 575). Lorenzo testified that appellant came toward the group with his gun drawn. At the same time, the second gunman was pointing his gun at "different people" in the group, and "moving" it around. On cross-examination, Lorenzo elaborated that the second gunman pointed the gun at all of the men in the group. From these facts, a reasonable jury could conclude that the second gunman (and vicariously, appellant) intended to frighten the group and to "create apprehension in [them] by engaging in some threatening conduct." *Robinson,* 506 A.2d at 574. Thus, the evidence sufficed to prove that appellant, either himself or through the second gunman, assaulted the group.

■ Second, appellant's intent to rob may be inferred from the "'totality of the evidence,'" *Carter v. United States,* 957 A.2d 9, 15 (D.C.2008) (quoting *Singleton,* 488 A.2d at 1367), presented in this case. Before the robbery, appellant put on a ski mask and said to his co-conspirators, "y'all ready, let's go." As appellant approached the group by the dumpster with his gun drawn, he said to Scales either "give that shit up," or "you know what it is, let me get that." Once Scales produced $20, appellant poked the gun into Scales's side and searched for more money. Meanwhile, the second gunman, also with gun drawn, walked behind the group "to the point where [if] [they] want[ed] to run he had a perfect angle to shoot [them]." From this evidence, the jury could reasonably have found that appellant and his co-conspirators intended to rob the entire group of individuals. *See Owens,* 497 A.2d at 1091. The fact that appellant did not in fact attempt to rob the others who were gathered by the dumpster is relevant, but it does not necessarily mean that appellant

did not intend to rob them when he first approached the group. In this case, the jury could have found that appellant would have searched and robbed the others as well, but decided to flee after Scales vigorously defended himself and told the others to run.

■ Yet, even if the jury found that appellant had an intent to rob only Scales, appellant is nonetheless liable for AWIR-WA as to all the members of the group. As we explained in *Long v. United States:*

> The [AWIRWA] statute defines the relevant offense as "assault with intent to ... commit robbery." D.C.Code § 22–501 (1989 Repl.). It does not provide that the assault and robbery victims must be the same, and we have therefore held that a conviction will stand where "the assault of one victim is used to effectuate the robbery of another at the scene." As in *Moore,* the assault in this case was "done in an effort to carry out the robbery." *Id.* at 925. The evidence accordingly was sufficient to prove that [appellant] has committed an assault with intent to commit robbery when he pointed the gun at [two persons], with the intent to rob [a third person] standing nearby.

687 A.2d 1331, 1345 (D.C.1996) (quoting *Moore v. United States,* 508 A.2d 924, 926 (D.C.1986) (per curiam)). Similarly, here, the second gunman assaulted the group by pointing his gun at them as appellant carried out the robbery of Scales. Thus, we conclude that the government presented sufficient evidence that appellant and his co-conspirators assaulted the group with the intent to commit a robbery. Because it is undisputed that appellant was armed during the robbery, the evidence sufficed to prove all elements of assault with intent to rob while armed.

## IV. Sufficiency of the Eyewitness Identification Evidence

██ Appellant challenges the sufficiency of the evidence supporting that he was the gunman who robbed Scales, arguing that "the evidence demonstrates that a reasonable person could not find that [Lorenzo's] identification of [appellant] as the gunman was convincing beyond a reasonable doubt." We agree with the government that the jury could find that the identification was sufficiently reliable because Lorenzo knew appellant from the neighborhood and Lorenzo had a good opportunity to view appellant on the evening of the robbery.

██ The testimony of a single identifying witness is sufficient to support a conviction. *See Lancaster v. United States,* 975 A.2d 168, 172 (D.C.2009); *In re R.H.M.,* 630 A.2d 705, 708 (D.C.1993). "When there is only a single identifying witness, 'the test is whether a reasonable person could find the identification convincing beyond a reasonable doubt, given the surrounding circumstances.'" *Gethers v. United States,* 684 A.2d 1266, 1274 (D.C. 1996) (quoting *Beatty v. United States,* 544 A.2d 699, 701 (D.C.1988)). In evaluating an eyewitness's identification, we must examine the evidence in the light most favorable to the government, *see R.H.M.,* 630 A.2d at 707, as it relates to the ability of the witness to make a meaningful identification, including:

> the witness' opportunity to observe and the length of time of the observations, the lighting conditions, the length of time between the observations and the identification, the stimuli operating on the witness at the time of the observation, as well as the degree of certainty expressed by the witness in making the identification.

*Beatty,* 544 A.2d at 701. "Where discrepancies exist between a description given of the perpetrator and the defendant's actual appearance, the conviction will still be affirmed if there is other evidence showing that the identification is reliable." *Id.*

Appellant does not argue that Lorenzo's testimony identifying appellant was not admissible. Instead, he points to fourteen discrepancies in Lorenzo's testimony to support his assertion that the evidence identifying appellant was insufficient to support a finding, beyond a reasonable doubt, that appellant was the first gunman. These discrepancies center on contradictions between Lorenzo's in-court testimony and his initial statement to the police,[21] and between his testimony and that of the other witnesses.[22] These discrepancies as

---

21. Detective Stallings testified that Lorenzo told him "at the precinct" that appellant was wearing "blue jeans and a white shirt"; however, at trial, Lorenzo testified that appellant was wearing all black on the night of the robbery. Lorenzo explained that he saw a group of boys, two of whom were wearing blue jeans and a white shirt, that he never told Detective Stallings that appellant was wearing blue jeans and a white shirt but that a "friend that was with [appellant]" did. In addition, Detective Stallings testified that Lorenzo told him that only two people had been by the dumpsters—Lorenzo and Scales, but Lorenzo testified at trial that there were five people by the dumpsters.

22. In his brief, appellant points to the following discrepancies in the testimony of the witnesses:

Lorenzo (and Scales) testified that "all three guys had black masks, black shorts, black T-shirts and black socks," and the gunman had on a "black shirt, black shorts, black socks, blacks boots." Shaelin, however, testified that she had seen appellant wearing a "red shirt" and "some blue jeans"; she had also seen a group of men wearing all black but said appellant was not in that group.

Lorenzo testified that they had been there for "at least a couple of hours, at least two hours," but Scales testified that he and his group had been by the dumpsters for "seven to ten minutes."

Lorenzo testified that three boys had followed the two gunmen, but Scales testified

well as any other evidence impeaching Lorenzo's credibility,[23] however, are for the jury to evaluate. *See Payne v. United States*, 516 A.2d 484, 495 (D.C.1986) ("It is axiomatic, that as assessors of a witness' credibility, the jury is always free to accept parts of a witness' testimony and reject other parts. Similarly, contradictions among witnesses at trial are inevitable and are matters for the jury to resolve as they weigh all the evidence.") (citations omitted). In this case, the inconsistencies appellant identifies, though numerous, see notes 21 and 22 *supra*, are "not of such proportion that a reasonable jury drawing reasonable inferences could not have resolved the conflicts, ascertained the truth, and found defendant guilty beyond a reasonable doubt." *Id.*

Further, any discrepancies regarding Lorenzo's description of the clothing worn by the first gunman do not weaken the reliability of the identification "if there is other evidence showing that the identification is reliable." *Beatty*, 544 A.2d at 701. Appellant was not a stranger; Lorenzo recognized him because they rode the school bus together and had played basketball approximately two months before the robbery. Lorenzo knew appellant well enough to know that he went by the name "Snoop" and that he had a tattoo on his arm that read "Rest in peace, Cheese." *See Redmond v. United States*, 829 A.2d 229, 234 n. 5 (D.C.2003) (noting that where a witness knows the defendant, an identification "contain[s] strong elements of reliability," and is therefore unlike "eyewitness identifications made by strangers, which may invoke more searching considerations"). In addition, Lorenzo testified that on the night of the shooting, he recognized appellant's face and dreadlocks *before* he covered his face with a black ski mask and that appellant had stood "right underneath" a light post about thirty-five feet away from where Lorenzo was standing by the dumpster. As a result, he identified appellant by name ("Snoop") when he spoke to Detective Stallings that same night, picked appellant out of a nine-person photo array four days later, and, the following day, identified appellant as the first gunman when he testified before the grand jury. With this other evidence, a jury could find that Lorenzo's identification of appellant was reliable despite any apparent inconsistencies between Lorenzo's testimony and Detective Stallings's statement as to what Lorenzo had reported to the police about the gunman's clothing (which Lorenzo disputed) and conflicts with the testimony of other witnesses. *See Beatty*, 544 A.2d at 701. Viewing the iden-

---

that a total of three people came around the corner.

Lorenzo testified that he recognized one of the boys in the group as Keith, who was wearing a polo shirt with white and blue stripes, but Shaelin testified that she recognized someone she knew as Kevin near the group of men in black, and he was wearing a light blue shirt and jeans.

Lorenzo testified that after the first gunman came around the corner, he said "give that shit up," but Scales testified that the gunman said, "you know what it is, let me get that." Lorenzo testified that he was the first person to be confronted by the group of boys, while Scales said that the group approached him first.

Lorenzo testified that the second gunman had worn a bandana, but Scales said that the second gunman wore a mask.

Lorenzo testified that the second gunman walked behind his group at the dumpster and the first gunman remained in front of the group, but Scales testified that two men walked past him and went together to the group by the dumpster while one of the group "stayed with" him.

Lorenzo testified that he heard two gunshots while Scales and the gunman were "tussling ... wrestling in the grass," but Scales testified that the gun went off only once as he and the gunman fell to the ground.

23. Lorenzo was impeached for being on probation for a "gun charge" at the time of trial.

tification evidence "in the light most favorable to the government and giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact," *Moore*, 927 A.2d at 1049, we conclude that Lorenzo's testimony identifying appellant as the first gunman is sufficient to support appellant's convictions.

## V. Merger Claims

Appellant brings two merger claims on appeal. "We review the issue[s] regarding the merger of [an appellant's] convictions *de novo* to determine whether there has been a violation of the Double Jeopardy Clause of the Fifth Amendment to the Constitution of the United States." *Nixon v. United States*, 730 A.2d 145, 151–52 (D.C.1999) (citing *Spain v. United States*, 665 A.2d 658, 661 n. 5 (D.C.1995)).

### 1. Merger of AWIRWA Convictions

▮ Appellant argues that his four convictions for assault with intent to rob while armed must be merged "because they resulted from a single assaultive act." We agree with the government that the counts do not merge because appellant committed separate assaults intending to rob each individual "rather than committing a single assault on the group as a whole."

"The Double Jeopardy Clause not only prevents the government from bringing a defendant to trial more than once for the same offense, but also protects against multiple punishments for the same offense." *Owens*, 497 A.2d at 1095 (internal quotation marks and citations omitted). The Double Jeopardy Clause, however, does not prohibit "separate and cumulative punishment for separate criminal acts," *id.* at 1094–95, or for criminal acts "perpetrated against different victims." *Hanna v. United States*, 666 A.2d 845, 855 (D.C. 1995). Yet, where a person commits one criminal act directed collectively toward a group of individuals, multiple convictions under the same statute will merge. *See Joiner v. United States*, 585 A.2d 176, 178 (D.C.1991) (holding seven ADW counts merged when defendant fired single shot in direction of group of seven men). "The question whether one transaction constitutes multiple offenses is one of legislative intent." *Brown v. United States*, 576 A.2d 731, 733 (D.C.1990).

In *Graure v. United States*, we articulated a framework for determining whether several assault convictions arising from a single incident merge under the Double Jeopardy Clause. 18 A.3d 743, 761–66 (D.C.2011). We explained that our analysis is rooted in "the factual circumstances of each case" and that several factors are relevant, including:

> (1) whether the episode consisted of "distinct, successive assaults"; (2) the number of individuals injured; (3) whether the defendant took a step toward effectuating physical injury (or stopped short of that, engaging only in conduct that could reasonably be expected to engender fear); and (4) whether the purpose of the relevant criminal statute is to proscribe specified conduct, or instead to protect individuals from harm.

*Id.* at 761 (footnote and citation omitted). In *Graure*, the defendant had set fire to a club full of patrons, which resulted in his conviction on three counts of AWIRWA and four counts of ADW. *Id.* at 750–52. He challenged his convictions for ADW, asserting that they should merge because they related to the "single act of lighting fire to gasoline." *Id.* at 761. We rejected his challenge, concluding that because the fire had placed four patrons in "the path of physical injury," *id.* at 762, and "the focus of attempted-battery is on the potential of an act of force or violence to cause injury to an individual or individuals," the proper

unit of prosecution is measured "as the number of individuals actually exposed to injury by the force that was used." *Id.* at 765.

We apply the tenets of *Graure* here. Thus, our analysis begins with the purpose of the criminal statute. *See id.* at 764. The assault with intent to rob statute provides that "[e]very person convicted of any assault with intent ... to commit robbery ... shall be sentenced to imprisonment for not less than 2 years or more than 15 years." D.C.Code § 22–401. The statute includes "intent-to-frighten" assault, which imperils a person by creating a reasonable fear of injury.[24] *See Comber v. United States,* 584 A.2d 26, 50 (D.C.1990). In *Graure* we noted the differences between intent-to-frighten assault and attempted-battery assault, and concluded that the unit of prosecution for an attempted-battery assault focuses on the number of individuals actually exposed to the injury. 18 A.3d at 765. In *Graure,* we did not need to decide the unit of prosecution for an intent-to-frighten assault, *see id.,* but we now decide that it too must focus on the individual—in particular, on the number of individuals exposed to a threatening act targeted to the individual that reasonably induces *fear* of injury.

Similarly, the District's general robbery statute is "unambiguously designed to protect persons" because " 'robbery ... is basically a crime against the person.' " *Davis v. United States,* 498 A.2d 242, 246 (D.C.1985) (holding two armed robbery convictions did not merge where defendant pointed pistol at two victims working in dry-cleaning store while accomplices removed cash from store counter) (quoting *United States v. Dixon,* 469 F.2d 940, 943

(D.C.Cir.1972)). Insofar as assault and robbery are each focused on the protection of the individual, it is apparent that the legislative purpose of the combined assault with intent to rob statute also must be to protect the individual from an attempted robbery by threat of force or violence. Consequently, the unit of prosecution of assault with intent to rob while armed should be geared to the number of individuals specifically targeted by the defendant threatening the robbery. *Cf. Murray v. United States,* 358 A.2d 314, 321 n. 23 (D.C.1976) (recognizing that statute penalizing "threats to do bodily harm," D.C.Code § 22–407 (2001), "announces the act of threatening to be the intended unit of prosecution"). Thus, where a group of individuals is exposed to a generalized threat of force, the assailant has committed a single assaultive act; however, where individuals in a group are targets of particularized threats of force, the assailant has committed successive assaultive acts. *See United States v. Alexander,* 471 F.2d 923, 933–34 (D.C.Cir.1972) ("[W]here by a single act or course of action a defendant has put in fear different members of a group towards which the action is collectively directed, he is guilty of but one offense. Multiple convictions and consecutive sentences will be appropriate only where distinct, successive assaults have been committed upon the individual victims.").

The question remains whether the evidence in this case supports that appellant and his co-conspirators assaulted each of the individuals in the group or whether their conduct comprised one assaultive act on the group as a whole. Here, appellant openly stated his intent to rob, physically attacked Scales by shoving a gun in his

---

24. For intent-to-frighten assault, the government must prove a threatening or menacing act that "reasonably would create in another person a fear of immediate injury" at a time when the defendant "had the apparent ability to injure." The defendant must have acted "voluntarily, on purpose, and not by mistake or accident." CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.100B. (2009).

side, and, in fact, did rob only Scales. However, when appellant came around the corner, to where the others stood by the dumpsters, Lorenzo testified, appellant pointed his gun "at us," which in context seems to refer to Scales and Lorenzo. This evidence of appellant's own actions does not support that he personally assaulted anyone else in the group. If that were the only evidence against appellant, only two assault convictions could stand. But there was more. Lorenzo testified that the second gunman stood behind the group "moving" his gun between "different people." Insofar as the jury could infer a series of intent-to-frighten assaults when the second gunman trained his gun on each of the four persons in the group, a separate assaultive act occurred as to each one.[25] See (Robert) Williams v. U.S., 569 A.2d 97, 99 n. 4 (1989) ("[A]ssaults that threaten or harm individual victims in a group constitute separate offenses."); accord Clark v. United States, 639 A.2d 76, 77–78 (D.C.1993) (merging assault convictions where the government conceded that the defendant's conduct constituted a single assaultive act). As the second gunman moved his gun, the jury could find, he aimed it specifically at each person in the group, and each one felt apprehension of imminent robbery by violence, even if others in the group also experienced the same apprehension when the gun was trained on them. Cf. Robinson, 506 A.2d at 575 ("An intent to frighten is sufficient, and that intent can be inferred from the pointing of a gun."). Thus, the second gunman would have committed "distinct, successive assaults," Alexander, 471 F.2d at 933–34, toward each member of the group, putting each one in apprehension of the immediate threat of robbery by force. As the second gunman was appellant's co-conspirator, we conclude that appellant is vicariously liable for his four assaults, one for each member of the group, and therefore appellant's convictions for AWIRWA do not merge.[26]

### 2. Merger of PFCV Convictions with Armed Robbery and AAWA

■ Appellant's final argument is that his two PFCV convictions merge with the underlying crimes—armed robbery and AAWA—because in the context of how his case was tried, "the two offenses of PFCV do not require proof of a factual element that the underlying offense[s] do[ ] not." The government contends that Thomas v. United States, 602 A.2d 647 (D.C.1992), forecloses appellant's argument. Thomas is instructive, but not entirely dispositive of appellant's argument. We conclude that the Double Jeopardy Clause does not prohibit appellant's convictions for both PFCV and the two predicate armed offenses.

The appropriate test for merger analysis was laid out by the Supreme Court in Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). There, the Court established that unless there is clear contrary legislative intent, "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." Id. at 304, 52 S.Ct. 180.[27]

25. The jury was instructed on both attempted-battery assault and intent-to-frighten assault. As discussed supra, the evidence was sufficient to support appellant's AWIRWA convictions under an intent-to-frighten theory. See supra Part III.

26. We are not persuaded by an appeal to the rule of lenity because " '[t]he Supreme Court has clearly indicated that where the principal legislative purpose is the protection of individual victims, the rule of lenity does not obtain.' " Graure, 18 A.3d at 764 n. 31 (quoting Alexander, 471 F.2d at 932).

27. In the District of Columbia, Blockburger principles have been codified in D.C.Code § 23-112 as a guide to sentencing:

We applied these principles to PFCV in *Thomas.* 602 A.2d at 653. In *Thomas,* the defendant was convicted of distribution of a controlled substance while armed, possession with intent to distribute a controlled substance (PWID) while armed, PFCV, possession of an unregistered firearm, and unlawful possession of ammunition. 602 A.2d at 647. He argued on appeal that his conviction for PFCV was "the same offense" as both PWID while armed and distribution while armed, and that therefore his convictions violated the Double Jeopardy Clause. *Id.* at 647–48. Noting that we have rejected the argument that merger analysis turns on the "evidence presented at trial," and considering only the statutory elements, we considered the statutory elements of each offense and legislative intent, and concluded that because each offense required proof of an element not required to prove the other, the PFCV convictions did not merge with the drug convictions. *Id.* at 654–55.

Appellant argues that *Thomas* is inapposite here because he is not contending that the evidence presented at trial, but rather the judge's instructions to the jury, should guide our merger analysis.[28] Appellant cites no authority for this proposition and we appear not to have addressed it. We do not find appellant's argument persuasive, however, because it runs counter to the purpose of the Double Jeopardy Clause. As we observed in Thomas,

> [t]he Double Jeopardy Clause, insofar as it applies to the problem of multiple punishments imposed following a single trial, limits only the authority of the courts and prosecutors.... Thus, "[t]he

question of what punishments are constitutionally permissible is not different from the question of what punishments the Legislative Branch intended to be imposed." ... [T]he court looks at the statutorily-specified elements of each offense and not the specific facts of a given case as alleged in the indictment or adduced at trial.

*Id.* at 648–53 (citing *Byrd v. United States,* 598 A.2d 386, 388–89 (D.C.1991) (en banc) (internal quotation marks and citation omitted)). We reiterate that, in the absence of clear statutory language or otherwise expressed legislative intent, the judicial task of determining whether different statutory offenses should be treated as the "same offense" for double jeopardy purposes is guided by *Blockburger's* test focused on the "statutory elements of the offenses." *See, e.g., Pelote v. District of Columbia,* 21 A.3d 599 (D.C.2011) (per curiam); *Joiner–Die v. United States,* 899 A.2d 762, 766 (D.C.2006); *Byrd,* 598 A.2d at 388–89; *Thomas,* 602 A.2d at 654. If the judge's instruction were to control the double jeopardy analysis, authority to define punishment would be shifted to courts and prosecutors and away from the legislature, contrary to the purpose of the Double Jeopardy Clause.

Having examined the language of the statutes at issue in this case, we conclude that the offenses require proof of different elements. First, with respect to the elements of armed robbery and AAWA, the District's enhancement statute for armed crimes provides: "Any person who commits a crime of violence, or a dangerous

---

A sentence imposed on a person for conviction of an offense shall, unless the court imposing such sentence expressly provides otherwise, run consecutively to any other sentence imposed on such person for conviction of an offense, whether or not the offense (1) arises out of another transaction, or (2) arises out of the same transaction

and requires proof of a fact which the other does not.
D.C.Code § 23–112.

**28.** The court defined the elements of armed robbery and AAWA as requiring that appellant be armed with a "firearm," as does PFCV.

crime in the District of Columbia *when armed with or having readily available any pistol* or other firearm (or imitation thereof) *or other dangerous or deadly weapon* ...." D.C.Code § 22–4502(a) (2001) (emphasis added). The PFCV statute, on the other hand, provides that: "No person shall within the District of Columbia *possess* a pistol, machine gun, shotgun, rifle, *or any other firearm or imitation firearm* while committing a crime of violence or dangerous crime...." D.C.Code § 22–4504(b) (emphasis added). As we explained in *Thomas*, "[s]ince there is no requirement [in the enhancement statute, § 22–4504(a) ] that the 'dangerous weapon' be limited to either a firearm or an imitation firearm, [the PFCV statute, § 22–4504(b) ] requires proof of a fact not required by [the armed enhancement statute]." 602 A.2d at 654. Moreover, because "possession is a broader concept than armed with/readily available ... [the armed enhancement statute] requires proof of a fact not required" by the PFCV statute. *Id.* Therefore, as we concluded in *Thomas*, "proof of possession does not necessarily prove armed with/readily available, and proof of a dangerous weapon does not necessarily prove a firearm or imitation thereof." *Id.* at 655. We see no reason here to depart from this conclusion.[29]

Appellant, citing *Jamison v. United States*, 670 A.2d 373 (D.C.1996), *Morton v. United States*, 620 A.2d 1338 (D.C.1993), and *Paris v. United States*, 515 A.2d 199 (D.C.1986), contends that we have "consistently interpreted" the term "armed with"

to be equivalent to "possession." Appellant is mistaken. In *Jamison*, the issue was whether the defendant charged with armed robbery had to actually *use* a weapon to be "armed" with it. We concluded that " 'armed robbery does not require the *use* of or *intent to use* a weapon in the commission of the robbery [or other violent crime]; it requires mere availability of a weapon.' " 670 A.2d 373, 374 (D.C.1996) (quoting *Washington v. United States*, 366 A.2d 457, 461 (D.C.1976) (alteration and emphasis in original)). *Jamison*, which was decided after *Thomas*, did not deal with the PFCV statute or purport to compare the "possession" element of PFCV with the "armed" element of the enhancement statute. *Morton* is also inapplicable. In *Morton*, the appellant challenged the sufficiency of the evidence for his "armed with" enhancement, arguing that there was no evidence that the weapon was "readily available" to him. 620 A.2d 1338, 1340–41 (D.C.1993). We vacated the enhancement of appellant's conviction, but left for another day "the precise question whether 'while armed with,' as distinct from 'having readily available,' may include a firearm not physically on the person of the defendant...." *Id.* at 1342. Finally, in *Paris*, the appellant challenged the sufficiency of the evidence as to whether he was armed, because there was no direct evidence that he was armed at the time of the crime. 515 A.2d 199, 203 (D.C.1986). We held that the evidence was sufficient for the jury to infer that the appellant was armed when he committed the crime even though

**29.** Appellant's argument that the offenses should merge because they carry the same mandatory minimum also cannot stand in light of *Thomas*. There, we explained that the legislative histories of the PFCV and the armed enhancement statutes—insofar as the Council amended the armed enhancement statute at the time it adopted the PFCV statute—"strongly indicates that the legislature

did not intend to treat offenses subject to the enhanced penalty provisions ... and offenses defined by [the PFCV statute] as the 'same offense.' " *Thomas*, 602 A.2d at 652. In addition, we outlined how the merger of the two offenses would have absurd results on sentences as required by the two statutes. *Id.* at 652–53.

no direct evidence was presented. *Id.* at 204. Contrary to appellant's assertion, these three cases do not undermine our understanding in *Thomas* that the element of "possession" in PFCV is analytically separate from and broader[30] than the elements of "when armed with" or having "readily available" in the enhancement statute.

Other cases, decided after *Thomas*, make this distinction clear. In *(Phillip) Johnson v. United States*, 686 A.2d 200 (D.C.1996), we held that "while (sic) armed with"[31] in the enhancement statute requires "actual physical possession." *Id.* at 205. The enhancement statute, however, also applies to a dangerous crime committed by a person who has a dangerous weapon that is "readily available." D.C.Code § 22–4502(a).[32] In *Clyburn v. United States*, 48 A.3d 147 (D.C.2012), we recently clarified that " 'having readily available' [under § 22–4502(a)] means in close proximity or easily accessible during the commission" of the underlying crime, and is not synonymous with "on or about," as required by the "carrying" concealed weapon offense, D.C.Code § 22–4504(a). *Id.* at 153–54. "Carrying" may be proven by actual or constructive possession, *Butler v. United States*, 614 A.2d 875, 885 n. 18 (D.C.1992), as is the case with PFCV under § 22–4504(b). We held in *Clyburn* that ready availability can be shown by

"lay or expert testimony (and reasonable inferences) describing the distance between" the perpetrator of the underlying crime and the weapon, "and the ease with which the [perpetrator] can reach the [weapon] during the commission of the offense." 48 A.3d at 154. Thus, even though the "when armed with" portion of the enhancement statute can be satisfied only by proving actual possession, the enhancement statute also may be satisfied by a showing that the weapon was "readily available," short of possession.[33] D.C.Code § 22–4502(a).

Consistent with these cases, we conclude that the armed offenses here, armed robbery and AAWA, required proof of elements not required in the PFCV offenses—that is, proof that the defendant was "armed with" *or* had "readily available" a dangerous weapon, which *could,* but need not, be a firearm. The PFCV offenses required proof of elements not required by the armed enhancement statute—that is, proof of "possession" of a "firearm." As these offenses are not the "same offense" for purposes of *Blockburger* and appellant's conviction of both offenses does not violate the Double Jeopardy Clause, appellant's convictions for PFCV do not merge with his convictions for armed robbery and AAWA.

\*　　\*　　\*

---

**30.** The element of possession in PFCV includes both actual and constructive possession. *See Taylor v. United States,* 662 A.2d 1368, 1372 (D.C.1995).

**31.** The statutory language is "when armed with." D.C.Code § 22–4502(a).

**32.** As noted in *(Phillip) Johnson,* the difference between "when armed with" and "readily available" is pivotal when it comes to sentencing. If the defendant is found to have been actually "armed," there is a mandatory

5–year minimum sentence; but if the enhancement statute applies because the weapon was "readily available," sentencing to a minimum 5–year term is within the judge's discretion. 686 A.2d at 204.

**33.** "Possession" includes constructive possession, which requires proof of an element of intent to control, *see Rivas v. United States,* 783 A.2d 125, 129 (D.C.2001) (en banc), in addition to the elements of knowledge and accessibility required for "ready availability," as set out in *Clyburn.*

For the foregoing reasons, appellant's convictions are hereby

*Affirmed.*