# WALLACE *v.* UNITED STATES.

CRIMINAL LAW; HOMICIDE; SELF-DEFENSE; PRAYERS FOR INSTRUCTION.

1. It is not error for the trial court in a homicide case to reject a prayer for the defense that while abusive words and epithets will not justify the taking of life, such words and epithets, if used by the deceased toward the accused at the time or immediately before the killing, are proper to be considered in determining whether the accused acted in self-defense, where the court in other prayers granted for the accused, covered the whole subject-matter by instructing the jury that they should consider the acts and words of the deceased and any threats made by him against the accused at the time of the killing.

2. A prayer for instruction on behalf of the accused in a homicide case in which the defense is that he acted in self-defense, is properly rejected, which states that if upon the whole evidence the jury have a reasonable doubt as to whether the deceased at the time of the killing had in his possession the axe in evidence, the accused is entitled to the benefit of that doubt.

3. Where, in a homicide case, it appears that the accused and deceased were rival lovers of the same woman, and that the accused shortly before the killing and after the deceased and the woman had been car-riding together, sought an explanation of the woman and said to the deceased that he would see him presently, it cannot be successfully contended by the accused that there is no evidence to support a prayer for instruction by the prosecution that if the jury believe that the accused provoked the difficulty with the deceased,

and in the progress thereof it became necessary to kill the latter to save himself from death or serious bodily harm, the defendant cannot justify the killing of the deceased on the ground of self-defense.

4. A prayer for instruction granted the prosecution in a homicide case that if the jury believe that the accused invited the deceased to speak with him for the purpose of provoking a difficulty with him in order that he might slay him, the accused cannot avail himself of the defense of self-defense, although he delivered the fatal stroke while in danger of death or serious bodily harm at the hands of the deceased, does not permit the drawing of an inference from an inference, and is not erroneous.

No. 1076. Submitted May 9, 1901.   Decided May 16, 1901.

HEARING on an appeal by the defendant in an indictment for murder from a judgment of the Supreme Court of the District of Columbia entered upon a verdict of guilty as indicted.                    *Affirmed.*

The facts are sufficiently stated in the opinion of the court.

*Mr. Royal A. Hughes* and *Mr. L. Malendez King* for the appellant:

1. While mere words will not justify the taking of life, they are proper to be considered by the jury as showing the animus of the deceased or party using them, and to determine the sufficiency of the provocation to reduce the killing to manslaughter.   If the words were words of menace of bodily harm, accompanied by some outward act showing an intent immediately to do the menaced harm, this would be sufficient provocation to reduce the killing to manslaughter.   Greenleaf Evidence, vol. 3, ¶ 124, p. 151; 1 Hale P. C. 456; 1 East P. C. 233; 1 Russell on Crimes, 580 (5th Eng. ed.); Munroe's Case, 5 Ga. 85.

2. It is the right of the parties to have the jury instructed on the law applicable to the case, clearly and pointedly, so as to leave no reasonable ground for misapprehension or mistake.   And it is the duty of the judge, when requested, to give any requested instruction, which is correct

as a proposition of law and applicable to the issues. Encyclopædia Pl. and Pr., vol. XI, p. 213; *Thornwegan* v. *King,* 111 U. S. 549; *Livingston* v. *Maryland Insurance Co.,* 7 Cranch (U. S.) 506. When requested to instruct on the doctrine of reasonable doubt the trial court should comply with the request, and the failure to do so will usually be ground for reversal. Encyclopædia Pl. and Pr., vol. XI, p. 357; *People* v. *Cohn,* 76 Cal. 386; *Treadway* v. *State,* 1 Tex. App. 669; *Goode* v. *State,* 2 Tex. App. 520; *Black* v. *State,* 1 Tex. App. 369.

3. It is improper to give an instruction where there is no evidence on which to base it, or to submit to the jury matters on which there is no evidence tending to prove. Encyclopædia Pl. and Pr., vol. XI, p. 170; *State* v. *Henderson,* 49 Ala. 20; *People* v. *Jones,* 24 Mich. 215; *State* v. *Osborne,* 45 Iowa, 425; *Crane* v. *State,* 111 Ala. 45; *Chamberlin* v. *State,* 25 Tex. App. 398; *Hash* v. *Com.,* 88 Va. 172; *Ward* v. *United States,* 14 Wall. (U. S.) 28; *United States* v. *Breitling,* 20 How. (U. S.) 252.

4. While the law permits the drawing of an inference from an established state of facts, yet it is a proposition of law well settled that the law does not permit the drawing of an inference from an inference. Gillett on Indirect & Collateral Ev., p. 67; *Douglas* v. *Mitchell,* 35 Pa. St. 440; *Morrissey* v. *Ingham,* 111 Mass. 63; *United States* v. *Ross,* 92 U. S. 281; *Throckmorton et al.* v. *Holt et al.,* Wash. L. R., vol. XXIX, p. 233.

*Mr. Ashley M. Gould,* United States Attorney for the District of Columbia, for the United States.

Mr. Justice MORRIS delivered the opinion of the Court:

This is an appeal from a judgment of the Supreme Court of the District of Columbia in a criminal cause wherein the appellant was convicted of the crime of murder and sentenced to capital punishment.

The homicide with which the appellant Boyd Wallace, is

charged took place on the evening of August 7, 1900. The appellant and the deceased were half-brothers, both somewhat powerfully built. For about five years the appellant had been living in criminal intercourse at a house No. 607 N street northwest, in the City of Washington, with a woman of his own race, Harriet Jackson, by whom he had a child; but about a month before the homicide she had ceased to cohabit with him, and had begun to cohabit with Robert Stafford, the deceased, who lived in the same house; and she testified at the trial that she had ceased to love the appellant. On the evening mentioned, having previously rescinded an engagement which she had made to go to a garden party with the appellant, she went with the deceased on a car-ride to Anacostia. On their return from the car-ride Harriet and Stafford were met by the appellant; and the three returned to their house. There soon afterwards, while the three were in the back yard, where also was one Hannah Reed, an aunt of Harriet Jackson, the appellant killed Stafford by stabbing him three times in the abdomen with a large open knife, the wounds from which proved fatal in a few hours. This knife the appellant had been carrying in his pocket for some time; it was about seven inches in length.

Just before the homicide some words had passed between the appellant and the deceased, and between the appellant and Harriet Jackson, which were deemed important by the prosecution as tending to show that the appellant provoked the difficulty which resulted in the homicide, and by the defense as sustaining the theory of self-defense upon which alone the appellant relied. The witnesses for the prosecution are not fully in accord between themselves as to what was then said or as to the circumstances preceding the homicide. The testimony of Harriet Jackson, as stated in the record before us, was to this effect:—

" That during the walk to the house the defendant asked her where she had been; she said,— ' To Anacostia, for a car-ride with Bob; ' defendant said,— ' That looks mighty funny; ' and that nothing more was said until they reached home; that when they reached home she and the defendant

went into the house, and that deceased, Stafford, remained in the front yard. Defendant said to her,—'Harriet, I want to speak to you:' he then said to the deceased,— 'Bob, I want to speak to you too:' she said,— 'If you want to speak to me, I am going in the yard, you can speak to me there;' and that she and the defendant went down the yard into the shed; that deceased accompanied them through the house and continued upstairs to his room; that up to that time the defendant had shown no signs of anger, but spoke in his ordinary tone of voice; that she and the defendant were seated in the shed near the door; that while in the shed the defendant said to her,— 'Harriet, it looks mighty funny that every time Bob gets paid you go car-riding with him.' On hearing his name mentioned the deceased rushed down in the yard, and said,—'What about Bob?' Defendant said,— 'Bob, I am not speaking to you; I will see you presently.' Deceased said with an oath,—'See me now;' and at that time they both passed blows; she could not say who passed the first blow: that the defendant was on the inside of the shed, and that the deceased was on the outside at the door; that when defendant and deceased began to pass blows and after they had advanced some distance upon the yard she ran into the kitchen, immediately followed by Hannah Reed; that she did not see a knife in defendant's hands, and that she was present when the trouble began, and did not see the defendant cut the deceased, nor did she see him have a knife, and that up to the time when she ran into the kitchen, followed by Hannah Reed, no cutting, so far as she saw, had taken place."

Hannah Reed, the other principal witness for the prosecution, stated in substance:—

"That on the Sunday night preceding the night of the tragedy the defendant had made threats against the deceased, and said when he got through with Bob the undertaker would gamble on his body; that she had not communicated the threats to the deceased; that on the night of the homicide, the 7th day of August, A. D. 1900, supper was served about five or six o'clock, and that defendant refused to sit at the

table while the deceased was eating his supper; that after supper the defendant, at the request of Harriet Jackson, went out to sell two tickets, and that a short while after the defendant left the house Harriet Jackson and the deceased went out for a car-ride; that some time after Harriet Jackson and the deceased left the house the defendant returned and asked for Harriet, and that she informed him that Harriet had gone out; that thereupon defendant went to her (Hannah's) room, and said,— ' Hannah, I want to speak to you; ' that defendant said to her,— ' Hannah, Bob is doing me wrong; Harriet had an engagement with me and has now gone out with Bob; ' and that defendant said,— ' My heart is broken; I cannot stand it any longer,' and that when he got through with Bob the undertaker would gamble on his body. *    *    * "

Then after narrating the manner of the return home of the parties later in the evening, she added,— " At that time the deceased came down and said,—'What about Bob ? '; and that defendant said,— ' I will show you what about Bob; ' that the defendant then pulled out his knife, opened it, and cut the deceased three times, and that the defendant cut the deceased without the deceased having done a single thing to the defendant; that she and Harriet Jackson ran into the kitchen; that Harriet ran first and she ran in behind her; that running into the kitchen she (Hannah) looked back and saw the defendant striking the deceased.    *    *    * "

The theory that the appellant acted in self-defense is supported solely by the testimony of the appellant himself who stated that the deceased, having heard his name mentioned, ran at the appellant with an axe, ran him into the woodshed and cut at him, with an expression that he would knock the appellant's brains out, and that he (the appellant) did not take the knife from his pocket until the deceased had run him into the woodshed, and he believed his life was in danger and he could not retreat with safety; that the appellant then went into the kitchen; and that the deceased walked up to the window and said,—" Open the door — I have the axe — I will kill the son of a bitch."

We understand that no exception was taken on either side to the testimony adduced, and none appears on the record. At its conclusion eleven instructions were requested on the part of the defendant to be given to the jury, and eight on the part of the prosecution. Nine of the former were given and two refused: of the latter, five were given, three of them with the acquiescence of counsel for the defendant, and three were rejected. Exception was reserved on the part of the defendant to the refusal of the court to grant the two of his eleven instructions which were rejected, and to the allowance by the court of the two instructions requested by the prosecution which were given without the acquiescence and over the objection of the defendant. And it is upon the action of the trial court in reference to these four instructions that the present appeal and the appellant's assignments of error are based.

It is added in the record before us that " thereupon the trial justice proceeded to charge the jury upon the law bearing upon the case; " and it seems to be conceded that the charge was impartial, fair, and just. At all events, no exception was taken to it, or to any part of it.

The verdict of the jury was, " Guilty as indicted; " and the prisoner was sentenced to be hung. From this judgment he has appealed.

1. The first of the two instructions requested by the appellant, and which were refused, and upon which the first assignment of error is founded, is the eighth in the series of eleven requested. It is in these words:—

" The court instructs the jury that, while abusive words and epithets alone will not justify the taking of life, yet any words or epithets that may have been proved to have been made by the deceased towards the defendant at the time or immediately before the cutting are proper to be considered by the jury in connection with all the other evidence in the case in determining whether the defendant acted in self-defense or not, as self-defense has been defined."

With regard to this instruction it is sufficient for us to say that the whole subject-matter of it was fully covered by

three other instructions, granted on behalf of the appellant, the second, third and fourth in his series; and that it is unnecessary to multiply instructions on the same point, which differ from each other only in language and not in substance. The most casual inspection of the three instructions referred to will show that they cover the point of this one which was rejected. They are as follows:—

" 2. If the jury find from the evidence that Stafford, by his words and acts on the night of the cutting, caused the defendant at the time of the cutting to believe in good faith and upon reasonable ground, and the defendant did believe, that he, Stafford, was about to make a deadly assault upon the defendant, then the jury are instructed that the defendant had a right to use all necessary means to defend himself against such apprehended assault.

3. If the jury find from the evidence that the deceased Stafford, just before the cutting which resulted in his death, approached the defendant in such a way as caused the defendant in good faith to believe, and gave him reasonable ground to believe, that Stafford was about to make a deadly assault upon him, then the defendant was justified in acting upon that belief.

" 4. The jury are instructed that, in determining whether the defendant, in taking the life of Stafford, acted in good faith under a reasonable apprehension that he was in danger of losing his own life or suffering great bodily harm at the hands of Stafford, they should take into consideration, along with the other evidence in the case, any threats which the jury shall be satisfied from the evidence Stafford had made against the defendant at the time of the cutting."

It adds nothing to the words and epithets assumed to have been used by Stafford to call them abusive. If they are to have any force at all, it is as threats against the accused; and if they were threats, they were already given to the consideration of the jury by the appellant's fourth instruction, while in the second instruction the jury had been directed to consider any words or acts of the accused at the time of the cutting, and the fourth instruction was still

broader in its scope. Now, the purpose of instructions is to elucidate the law to the jury; but their multiplication plainly tends to confuse them and to embarrass the administration of justice. We think, therefore, that the instruction in question was properly rejected.

2. The appellant's second assignment of error is founded upon the refusal of the trial court to give to the jury the tenth in his series of instructions, which was in the following words:—

" The jury is instructed that if upon the whole evidence they have a reasonable doubt as to whether Stafford, at the time of the cutting which resulted in his death, had in his possession the axe which is in evidence, the defendant is entitled to the benefit of that doubt."

We think that this instruction also was properly rejected. Its effect, if granted, would have been to segregate a single piece of evidence, without any good reason for such segregation, and to make the question of reasonable doubt depend upon it, when that question was fully covered by other instructions granted on behalf of the appellant, as it actually was in the present case. Instructions upon separate items of evidence are more apt to confuse than to enlighten a jury. 2 Thompson on Trials, par. 2329. Moreover, the instruction is in itself deficient in precision, and for that reason erroneous in point of law. If the benefit of doubt, which it sought to give to the accused, be the benefit of doubt which should secure his acquittal, as the instruction may naturally be construed, it is manifestly erroneous, because the mere fact that the deceased had an axe in his possession is no proof of anything. Without something additional to show felonious purpose, the mere possession of an axe is an entirely innocent thing, and cannot of itself either excuse or palliate homicide.

3. The third assignment of error arises upon the second of the eight instructions requested by the prosecution, and which was one of the five of those that were given. It is in the following terms:—

" If the jury believe from the evidence that the defendant

Boyd Wallace provoked the difficulty with Robert Stafford, and in the progress thereof it became necessary to kill the latter to save himself from death or serious bodily harm, yet the defendant cannot justify the killing of Stafford on the ground of self-defense."

This seems to be conceded by counsel for the appellant to be in itself correct law. The contention is that there is no evidence to support it. But we think that there was sufficient evidence to warrant this instruction. In the conduct of the appellant and in the words used by him towards the deceased — "Bob, I will see you presently"— there was sufficient to justify the jury in drawing the inference of a purpose on the part of the defendant to provoke a quarrel with the deceased. These words, and the circumstances under which they were uttered, certainly implied an intention to call the accused to an account for his intimacy with Harriet Jackson; and experience teaches us that the calling of a rival to account in such cases means bloodshed and homicide. And so, if there was testimony tending to show an intention to provoke a quarrel, it was not error to give the instruction in question.

4. The fourth assignment of error relates to the fifth instruction requested by the prosecution and given by the court to the jury, which is as follows: —

"If the jury believe from the evidence that the defendant invited the deceased Robert Stafford to speak with him for the purpose of provoking a difficulty with him in order that he might slay him, then he cannot avail himself of the defense of self-defense, although he delivered the fatal stroke while in danger of death or serious bodily harm at the hands of the deceased."

It is argued on behalf of the appellant that this instruction permits the drawing of an inference from an inference, which is inadmissible in law. But we fail to find that this criticism is justified by the tenor of the instruction. There is but one inference sought to be drawn, that of homicidal purpose in provoking a quarrel and in the course of such quarrel a deadly encounter. The law is that he, who has

11

provoked a quarrel, which is calculated to lead to homicide, and which in fact does lead to homicide, cannot thereafter claim as an excuse for the homicide that he acted in self-defense. The inference here sought to be drawn is whether certain words, or certain words and conduct, implied an intention to provoke a quarrel, and not whether the quarrel so provoked was intended for the purpose of committing the homicide. If the quarrel in its nature and character was homicidal, as the quarrel between the appellant and the deceased undoubtedly was, the law itself draws the inference of a purpose to slay. But the inference which may not be built upon an inference is the inference of one fact from some other fact, which is itself merely an inference. The intent of the appellant in the invitation which he extended to the deceased to confer with him, is the fact here to be inferred. The jury were told by the instruction in question that from such invitation they might infer homicidal purpose on the part of the appellant; but they were not told that from such homicidal purpose they might infer something else necessary to be made apparent.

We find no error in any of the instructions granted by the trial court, and no error in the rejection of those which are refused. It appears to us from the record that the appellant had a just, fair, and impartial trial, and that the rulings of the court were as favorable to him as he could reasonably have expected.

We must *affirm the judgment appealed from. And it is so ordered.*