*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CF-1015

DERRICK WATSON, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF3-12378-17)

(Hon. Craig Iscoe, Trial Judge)

(Argued June 30, 2021                    Decided January 27, 2022)

*Deborah A. Persico* for appellant.

*Bryan H. Han*, Assistant United States Attorney, with whom *Michael R. Sherwin*, Acting United States Attorney at the time, and *Elizabeth Trosman*, *John P. Mannarino*, *Monica Trigoso*, and *Rachel Bohlen*, Assistant United States Attorneys, were on the brief, for appellee.

*Daniel Gonen*, Public Defender Service, with whom *Samia Fam* was on the brief, filed an amicus curiae brief in support of appellant.

Before BLACKBURNE-RIGSBY, *Chief Judge*, THOMPSON,[*] *Associate Judge*, and FISHER, *Senior Judge*.

THOMPSON, *Associate Judge*:  A jury convicted appellant Derrick Watson of several assault and weapons charges in connection with a shoot-out that occurred on the evening of July 10, 2017.  In this appeal, appellant, supported by *amicus* Public Defender Service (PDS), contends that his assault and associated weapons convictions must be reversed because they followed upon the trial court's having given the jury a number of instructions that were not supported by the evidence or were otherwise erroneous:  a forfeiture (of self-defense)-by-provocation instruction; an urban gun battle (UGB) instruction; and a concurrent-intent instruction.  Appellant also argues that the government failed to disprove beyond a reasonable doubt his claim of self-defense; that the evidence was insufficient to support most of his convictions;[1] and that some of his convictions must merge.  For the reasons that follow, we reverse appellant's conviction of assault with

---

[*] Judge Thompson was an Associate Judge of the court at the time of submission.  Although her term expired on September 4, 2021, she will continue to serve as an Associate Judge until her successor is confirmed.  *See* D.C. Code § 11-1502 (2012 Repl.).  She was qualified and appointed on October 4, 2021, to perform judicial duties as a Senior Judge and will begin her service as a Senior Judge on a date to be determined after her successor is appointed and qualifies.

[1] Appellant does not challenge his conviction for unlawful possession of a firearm (felon in possession (FIP)).

significant bodily injury while armed (ASBIWA) and the associated conviction of possession of a firearm during a crime of violence (PFCV).  We also vacate all but one of appellant's convictions of assault with a dangerous weapon (ADW) (intent to frighten) and the PFCV convictions associated with the vacated convictions. We affirm the remaining two ADW convictions, the two related PFCV convictions, and the FIP conviction.

## I.

The government's evidence in this case was presented largely through the testimony of a number of witnesses (Jamal Quigley, Geraldine Quigley, Elena Harris, and Shianne Washington) who were residents of the Wylie Court condominium complex located in the 1300 block of I Street, N.E., and who were socializing outside in the complex's courtyard on the evening of the shooting; and through video footage (Government Exhibit 600A) from a motion-activated surveillance camera mounted on one of the condominium units, which was played for the jury along with a slide show consisting of still shots taken from the video

footage.[2]  As the video depicts, on the summer evening in question, a number of residents and their guests, including "a lot of kids" and grandparents, were socializing or playing in the courtyard.  Government witnesses testified that appellant and Saheed Salu had been playing "craps" in the courtyard.  An argument broke out, with appellant (whom Ms. Quigley heard lament, "I let you back around here") accusing Mr. Salu of cheating at the game.  Mr. Salu had lost money, was "very hyped" and "upset," and left the courtyard.  He returned a couple hours later along with Kevin Williams.

Upon his return, Mr. Salu approached appellant.  Although appellant tried to calm Mr. Salu down, the two "had words" (which Ms. Harris described as "not too . . . nice" words).  Ms. Harris testified that the gist of the conversation appeared to be:  "[W]e can be friends[] [b]ut if you don't obtain what I'm saying and take it the way I'm saying it to you, then it could go another way."  After the conversation, appellant "felt some type of way," according to Mr. Quigley.  At that point, appellant walked to his car, which was parked somewhere between 34 and 52 feet

---

[2] Metropolitan Police Department (MPD) Detective David Gargac identified individuals shown in the video as it played.

away from various parts of the courtyard;[3] got inside the car and stayed there for about nine or ten seconds, according to the video timestamp; and then re-emerged and walked back toward the courtyard and Mr. Salu. In closing argument, and referring to slide 505 in the slide show, one of the prosecutors urged the jury to find that appellant, while walking back toward Mr. Salu, gestured in a way to show that he had a gun.[4] As appellant began speaking again with Mr. Salu, Mr. Williams approached appellant; appellant noticed and appeared to step or lunge toward Mr. Williams, gun in hand and arm outstretched; Mr. Williams shot at appellant; and an exchange of gunshots ensued. Thereafter, Mr. Salu, who had pulled out a gun, fired at appellant and "shot all over the place," and, according to witnesses, appellant returned fire in the direction of Mr. Salu.[5] At one point, appellant returned to his car and reached inside, and Ms. Harris saw Mr. Watson reload (i.e., "put another clip into") his gun.

---

[3] As shown in the video, appellant's car was parked in the street, on the other side of a row of cars that were in parking spaces immediately perpendicular to the courtyard.

[4] Appellant and *amicus* do not dispute that the video depicts a gesture by appellant, but suggest that appellant could have been adjusting his pants or scratching an itch.

[5] No such shots are shown on the video, but a detective and a litigation technology witness testified that the motion-activated camera "skips," and the prosecutor argued that the camera therefore did not capture everything that occurred.

During the gunfire, people who were in the courtyard scattered, running and screaming. Mr. Quigley was in the courtyard with his thirteen-month-old son Jeremiah White, who was in a stroller. Mr. Quigley testified that he was "stuck" because bullets were "coming from both ways." Ms. Washington testified that "shots were kind of coming from everywhere" and that the children, including six-year-old Jaidyn Turner (who Ms. Harris testified was "screaming"), were "kind of scared." Ms. Washington grabbed Jaidyn to shield her and just stood still, believing that if she ran, they might get hit by a bullet.

Eventually Mr. Salu and Mr. Williams ran away from the courtyard, and appellant entered his car and drove off. When Mr. Quigley got Jeremiah inside, the child's great-grandmother attempted to change his diaper, saw blood, and realized that he had been shot. At the hospital, doctors discovered that he had three gunshot wounds: one on his lower back, a second on his upper buttocks, and a third in his upper thigh centimeters from his femoral artery, where a bullet was lodged.

A ballistics expert testified that three guns were used during the shoot-out, including a .40 caliber weapon that fired at least seven of the 13 or 14 casings,

bullets, or fragments that were found.  Based on where cartridge casings were found, the parties argued that appellant was the shooter of the .40 caliber ammunition.

Appellant did not testify.  Messrs. Salu and Williams, who were also charged in the incident, entered guilty pleas to assault with intent to kill while armed (AWIKWA).

The jury acquitted appellant of the several counts of AWIKWA with which he was charged, but convicted him of one count of ADW against Mr. Williams (on both attempted-battery and intent-to-frighten theories); ADW (intent to frighten) against Mr. Salu, Mr. Quigley, Jeremiah, and Jaidyn; ASBIWA (against Jeremiah); PFCV related to each armed assault conviction; and FIP.  The trial court sentenced appellant to an aggregate term of eighty months' imprisonment, including 48 months for ADW against Mr. Williams, sentences (concurrent to each other) of 20 months for each ADW (intent to frighten) conviction, 12 months for FIP, and (concurrent with all of the foregoing and with each other) 60 months for ASBIWA and 60 months for each of his six PFCV convictions.  This appeal followed.

**II.**

Although appellant raises his various claims with respect to all of his convictions except the FIP conviction, we are able to narrow our discussion by disposing at the outset of his convictions of intent-to-frighten assault against Mr. Quigley, Jeremiah, and Jaidyn. The underlying charges appear to have been based on the evidence that the gunfire created apprehension in Mr. Quigley (who testified that he was "stuck" in the crossfire between Mr. Watson and Mr. Salu) and in six-year-old Jaidyn (who was "screaming" and "scared" at the sounds of gunfire). But there is an issue as to whether appellant had the requisite intent to create apprehension in this group of bystanders[6] (and, we think, as to whether the gunshots had the potential to create apprehension in a one-year-old such as Jeremiah). Further, as appellant's brief notes, the government's brief does not respond to his argument that the evidence was insufficient to support the

---

[6] *See Snowden v. United States*, 52 A.3d 858, 868 (D.C. 2012) (explaining that to prove intent-to-frighten assault, the evidence must show "the defendant intended either to cause injury or to create apprehension in the victim by engaging in some threatening conduct." (quoting *Robinson v. United States*, 506 A.2d 572, 574 (D.C. 1986))).

convictions of intent-to-frighten assault against Mr. Quigley, Jeremiah, and Jaidyn.

Moreover, the government concedes that Mr. Watson's convictions of intent-to-frighten assault against Mr. Quigley, Jeremiah, and Jaidyn merge with his conviction of the same offense against Mr. Salu.[7]  In light of all the foregoing, we vacate appellant's convictions of intent-to-frighten assault against Mr. Quigley, Jeremiah, and Jaidyn.

### III.

---

[7] "In general, where the evidence is that the defendant committed a single assaultive act directed at a group of persons, such as firing a single shot, multiple assault convictions will merge." *Graure v. United States*, 18 A.3d 743, 761 (D.C. 2011).  However, "[w]here a defendant has reason to know that his . . . intended target[s] [are] not alone and fires multiple shots in their direction, multiple convictions for ADW are permitted." *Mobley v. United States*, 101 A.3d 406, 420 (D.C. 2014); *see also Gray v. United States*, 585 A.2d 164, 165 (D.C. 1991) (holding that when a defendant fired three shots through a screen door, seeing three children, "separate crimes were committed, and separate sentences were appropriate[,]" although only one child was struck by a bullet).  Under the foregoing case law and in light of the testimony from Mr. Quigley and Ms. Washington about the gunshots "coming from both ways" and "kind of coming from everywhere" during the shoot-out between appellant and the other shooters, the evidence, if it were otherwise sufficient, would at least arguably support multiple convictions for intent-to-frighten ADW.  Nonetheless, we accept the government's concession as to merger.

We now turn to appellant's and the *amicus* brief's challenges to the court's giving of the provocation instruction. The instruction the court gave the jury was as follows:

> If you find that Mr. Watson provoked imminent danger of bodily harm upon himself, he cannot rely upon the right of self-defense to justify his use of force. One who deliberately puts himself in a position where he has reason to believe that his presence will provoke trouble cannot claim self-defense.[8]

Appellant — whose defense at trial was that he fired shots only in self-defense after Mr. Williams shot first — argues that there is no factual or legal support for "the idea that he 'provoked' the shooting merely because he approached Salu instead of staying in his car[.]" He asserts that there was no evidence that he knew Mr. Williams and Mr. Salu were armed and thus no

---

[8] *Amicus* takes issue with the "reason to believe" language of this instruction, but appellant did not challenge the language of the instruction in the trial court and does not argue that the language of the instruction requires reversal of his convictions. Thus, any such challenge is not properly before us. *See Thigpen v. Greenpeace, Inc.*, 657 A.2d 770, 772 n.5 (D.C. 1995) (declining to entertain new issues initially raised by an *amicus*).

evidence that he had a reason to believe that his return to the courtyard from his car would provoke a gun battle.[9]

Appellant is correct that no witness testified that Mr. Williams had displayed a gun before appellant went to or returned from his car, and that no witness testified that Mr. Williams was known to carry a gun. However, Ms. Harris testified that she was aware that Mr. Salu "carries weapons" and that he was a "sore loser" at craps who "gets very aggressive when he loses money." Her testimony was evidence from which the jury could infer that appellant, who had known Mr. Salu for some time (at least long enough to have "let [him] back around here"), also knew that Mr. Salu was armed and that gun violence would likely follow if he (appellant) returned to the courtyard with a gun. In addition, the

---

[9] Appellant argues that the evidence that he stood with his back to Mr. Williams when he walked toward Mr. Salu is evidence that he did not know Mr. Williams was armed. That argument seems logical but — we know from the full record — the point it makes appears to be factually incorrect. Although no evidence was presented at trial about what appellant said during his custodial interview after his arrest, the government's memorandum in aid of sentencing states that appellant admitted during the interview that when Mr. Salu returned to the courtyard with Mr. Williams, he (appellant) saw Mr. Williams's gun, which Mr. Williams was holding between his leg and the fence. Appellant told his interviewers that it was at that point that he (appellant) went to his car. Appellant also admitted during the interview that he had warned Mr. Salu that if Mr. Salu returned to the courtyard after the verbal altercation, that would be a "problem."

evidence permitted the jury to infer that appellant's purpose in going to his car was to arm himself because he believed Mr. Salu and Mr. Williams were armed or were otherwise a threat to him.[10]  The jury could also infer from appellant's gesture when he exited his car that he was displaying the gun, or perhaps adjusting his clothes to accommodate it, either of which tended to support a finding that he had just retrieved the gun from his car.  Further, the jury could infer from appellant's reaction upon noticing Mr. Williams approaching him — specifically, appellant's stepping or lunging toward Mr. Williams with his gun at the ready — that appellant already believed that Mr. Williams was a threat to him.  And the fact that the exchange of gunfire by all three men — appellant, Williams, and Salu — started within seconds of appellant's returning from his car and approaching Mr. Salu, allowed the jury to find that appellant's actions did indeed trigger the violence.  In short, the evidence and reasonable inferences therefrom provided ample support for giving a provocation instruction.

*Amicus* argues, however, that the provocation instruction the court gave, as well as this court's case law on which it was based, strayed from what PDS and

---

[10] The video evidence that appellant reloaded his gun only after returning momentarily to his car was evidence from which the jury could infer that the car was where appellant kept his weapon and his ammunition.

appellant assert are the controlling precedents: *Beard v. United States*, 158 U.S. 550 (1895)[11]; *Thompson v. United States*, 155 U.S. 271, 277, 283 (1894); and *Wallace v. United States*, 18 App. D.C. 152 (D.C. Cir. 1901). PDS reads these precedents as requiring, in contrast to this court's more recent opinions discussing the provocation instruction, an intent to provoke difficulty (or, as *amicus* puts it, "a purpose to provoke a violent response") in order for a claim of self-defense to be forfeited. We disagree with that reading of those precedents and adhere to this court's instruction that to invoke the forfeiture-of-self-defense-by-provocation doctrine, "the government is not required to prove that the defendant acted with the intent to provoke his adversary to violence." [12]

---

[11] The government asserts that it is not clear that *Beard*, a case originating in Arkansas "Indian country," 158 U.S. at 551, is binding precedent in our jurisdiction. We do not decide the issue.

[12] *Andrews v. United States*, 125 A.3d 316, 322 (D.C. 2015); *see also, e.g.*, *Sams v. United States*, 721 A.2d 945, 952, 953 (D.C. 1998) (stating that it "has never been the law in the District of Columbia" that a "claim of self-defense is defeated only if the defendant returns to his adversary with the intent to provoke violence, and then engages in behavior adequate to provoke the level of violence displayed by his adversary"; explaining that "self-defense is not available to a defendant who deliberately puts himself in a position where he has reason to believe that his presence will provoke trouble, even if his purpose in putting himself in that position was benign").

*Amicus* acknowledges this court's long line of cases affirming the foregoing rule, but argues that the "reason to believe that his presence will provoke trouble" standard is tainted by the fact that its initial articulation came in *Laney v. United States*, 294 F. 412 (D.C. Cir. 1923). *See id.* at 414 (concluding that because Laney

(continued…)

As described in *Beard*, when Mr. Beard arrived home, he approached the lot adjoining his house to join a group of brothers with whom he had been having a dispute about a cow, and likewise to join his wife, who had driven the cow back into the lot to keep the brothers from taking the animal. 158 U.S. at 552. Mr.

---

(…continued)

had "every reason to believe that his presence [in the areaway] would provoke trouble," his "adjusting his revolver and going into the areaway was such as to deprive him of any right to invoke the plea of self-defense"). We acknowledge that the facts of *Laney* reflect its historical context of pernicious racial stereotypes, which, according to works cited by *amicus*, were fueled in part by news accounts of the time that readily blamed black people who had armed themselves against white mobs in the District of Columbia that were attacking black citizens (while the police stood idly by). *Amicus* Br. at 6-9 (citing additionally José Felipé Anderson, *The Criminal Justice Principles of Charles Hamilton Houston: Lessons in Innovation*, 35 U. Balt. L. Rev. 313, 318 (2006) (referring to the "obvious racial overtones of [*Laney*]"); Margaret Raymond, *Looking for Trouble: Framing & the Dignitary Interest in the Law of Self-Defense*, 71 Ohio St. L.J. 287, 307 (2010) (calling *Laney* "an old case laden with racist views"; *see also id.* at 333 (noting the "irony in limiting individuals' access to self-defense most aggressively in circumstances in which reliance on law enforcement is least likely to help them")). The *Laney* court held that Mr. Laney, a black man who had been pursued by such a mob and had escaped to a safe place, forfeited his right to defend himself by going back out into the street while armed with a gun to head to work while the mob was still rampaging. We do not doubt that the *Laney* court's unapologetic application of the provocation rule as a matter of law — the court concluded that there was "but one inference to be drawn," *id.* at 415, i.e., that "self-defense does not enter into the case," *id.* at 413 — reflected the racial attitudes and tensions of the time. But we regard the provocation standard itself, articulated in *Laney*, as a valid extension of the "long . . . accepted" principle "that one cannot support a claim of self-defense by a self-generated necessity to [use potentially lethal force]." *United States v. Peterson*, 483 F.2d 1222, 1231 (D.C. Cir. 1973).

Beard happened to be carrying with him a shotgun "that he was in the habit of carrying, when absent from home." *Id.* When he saw one of the brothers reach into his pocket as if to pull out a pistol, he struck that brother with the butt of his shotgun, killing him. *Id.* at 553. Although noting that Mr. Beard was aware that one of the brothers had previously threatened to kill Beard if he could not get the cow, *id.* at 552, the Court observed that "[t]here was no evidence tending to show that Beard went from his dwelling-house to the orchard fence for the purpose of provoking a difficulty, or with the intent of having an affray with the Jones brothers or with either of them." *Id.* at 558. "On the contrary," the Court observed, "from the outset of the dispute, [Beard] evinced a purpose to avoid a difficulty or an affray." *Id.* Further, the Court noted, Beard "did nothing to provoke a difficulty, and prior to the moment when he struck [the decedent] with his gun he made no demonstration that indicated any desire whatever on his part to engage in an affray or to have an angry controversy," and he "neither used, nor threatened to use, force against" the brothers (but "only commanded them, as he had the legal right to do, to leave his premises"). *Id.* There also was no "reason to believe that there was an agreement to fight with deadly weapons." *Id.* at 559.

The Court indicated, through some of the language just quoted, that a purpose to provoke difficulty or "the intent of having an affray" or "an agreement

to fight with deadly weapons" could be enough to negate a claim of self-defense. *Id.* at 558, 559. The Court did not suggest, however, that a purpose to provoke difficulty is a *sine qua non* of provocation that would negate a claim of self-defense. To the contrary, the Court implied that an indication by Beard that he desired to engage in an affray or an action by him threatening to use force might have precluded a claim of self-defense. Further, nothing in the facts as recited by the Court suggested that Mr. Beard knew or suspected that the decedent would have a deadly weapon or that it was for that reason that Mr. Beard went into the lot while carrying his shotgun, so the Court had no occasion to consider whether those facts would have negated a self-defense claim.

We note in addition that the decision to reverse the manslaughter conviction in *Beard* was based on a number of factors, including the Court's conclusion that the evidence did not support the instructions given, the fact that Mr. Beard "was on his own premises, near his dwelling house," *id*. at 560, and the complicating presence of an erroneous instruction on the duty to retreat. In sum, even if we assume for the moment that *Beard* is binding upon us, see note 11 *supra*, its statements regarding forfeiture by provocation do not convince us that our own decisions on that subject were wrongly decided.

In *Thompson*, the Court reversed a murder conviction of defendant Thompson, who had armed himself with a rifle before he took the only road by which he could return home, though the road took him past the field of a neighbor who had threatened him when he passed by earlier, and whom Thompson shot and killed when he tried to make good on the threat on Thompson's way home. *See* 155 U.S. at 275-76. The Court stated that it was error to assume "that the act of the defendant in arming himself showed a purpose to kill formed before the actual affray." *Id.* at 283. The Court's discussion ("there was no other road for him to return by[] except the one alongside the field," *id.* at 275) implies that the necessity for Thompson to utilize the road was relevant to whether his arming himself for the return trip should be interpreted as a defensive step or instead as indicative of an intent to have an affray. The reasoning in *Thompson* foreshadowed the reasoning in this court's recent jurisprudence: "[I]f one has reason to believe that he will be attacked, in a manner which threatens him with bodily injury, he must avoid the attack *if it is possible to do so*." *Andrews*, 125 A.3d at 322 (emphasis added, internal quotation marks omitted).

In *Wallace*, the D.C. Circuit, focusing on the physical altercation that ensued between defendant Wallace and the murder victim Stafford, found that it was not error to give a provocation instruction "if there was testimony tending to show an intention to provoke a quarrel." 18 App. D.C. at 161.[13] The court recognized that it was up to the jury to decide whether the defendant's "words and conduct[] implied an intention to provoke a quarrel," *id.* at 162, but it did not say that a

---

[13] Specifically, the court said:

> In the conduct of the appellant and in the words used by him towards the deceased – "Bob, I will see you presently" -- there was sufficient to justify the jury in drawing the inference of a purpose on the part of the defendant to provoke a quarrel with the deceased. These words, and the circumstances under which they were uttered, certainly implied an intention to call the accused to an account for his intimacy with Harriet Jackson; and experience teaches us that the calling of a rival to account in such cases means bloodshed and homicide. And so, if there was testimony tending to show an intention to provoke a quarrel, it was not error to give the instruction in question [which in full was "[i]f the jury believe from the evidence that the defendant Boyd Wallace provoked the difficulty with Robert Stafford, and in the progress thereof it became necessary to kill the latter to save himself from death or serious bodily harm, yet the defendant cannot justify the killing of Stafford on the ground of self-defense."].

*Id.* at 160-61.

provocation instruction may be given only where the defendant intended to provoke a quarrel.

In this case, appellant left his "not too . . . nice" exchange with Mr. Salu, which had devolved into a realization that what had started as an effort to make peace "could go another way," and which left appellant visibly "fe[eling] some type of way." Appellant got into his car, where he sat safely for nine or ten seconds. The jury was given no reason to think that appellant could not have driven away to avoid an affray,[14] or that he had a need to return to the courtyard. If the jurors inferred that appellant knew that Mr. Salu and/or Mr. Williams was armed or was otherwise a threat to him, they could reasonably find that by arming himself and returning to the courtyard, or by returning to the courtyard and displaying or signaling that he had a gun (even one that had been on his person all along),[15] he "desire[d] . . . to engage in an affray" and "threatened to fight with a

_____

[14] As the video shows, no other vehicle was blocking appellant's vehicle.

[15] As noted above, the prosecutor urged the jury to find from the video evidence and still slides that after going to his car, appellant gestured to indicate that he had a gun. The video and slides are not so sharp and clear as to preclude a difference of opinion about what appellant did with or held in his hand, and the jury was not required to accept the prosecutor's interpretation of what the video showed. But we are satisfied that the evidence permitted them to find as the prosecutor urged.

deadly weapon," *Beard*, 158 U.S. at 558,[16] and, consistent with all the foregoing authorities, forfeited a claim of self-defense. That is so even if the jury found (as the video seems to show) that Mr. Williams shot first. *See Howard v. United States*, 656 A.2d 1106, 1111 (D.C. 1995) (concluding that even if someone other than the defendant "made the first move for a gun once [the defendant] had arrived, armed," "the degree of initiative [the defendant] had taken in creating the confrontation precluded a claim of self-defense."). Accordingly, the evidence supported the giving of the provocation instruction, which we conclude did not misstate the law.

**IV.**

Mr. Watson's trial took place before this court issued its en banc decision in *Fleming v. United States*, 224 A.3d 213 (D.C. 2020) (en banc). Over Mr. Watson's objection that the UGB theory does not apply to non-homicide cases, the trial court gave jurors essentially the same pattern UGB instruction that this court explicitly

---

[16] *Cf. Andrews*, 125 A.3d at 323 ("The jury could infer from the fact that appellant brought a loaded gun with him that he foresaw he was about to face a grave danger and prepared to meet it head-on.").

approved in *Roy v. United States*, 871 A.2d 498 (D.C. 2005), but that we criticized in *Fleming*:

> To prove causation, it is not necessary for the government to prove that the defendant personally fired the weapon that caused an injury. Rather, if the government proves beyond a reasonable doubt, one, that Mr. Watson was armed, prepared, and aware of the substantial risk of harm of engaging in a gun battle and disregarded that substantial risk; two, he did, in fact, engage in a gun battle at the 1300 block of I Street Northeast in Washington, D.C.; three, he did not act in self-defense . . . at the time that he participated in the gun battle; four, Mr. Watson's conduct on the 1300 block of I Street Northeast in Washington, D.C. was a substantial factor in the assault; and, five, it was reasonably foreseeable that death or serious bodily injury to innocent bystanders could occur as a result of Mr. Watson's conduct on the 1300 block of I street Northeast, then, as a matter of law, Mr. Watson is deemed to have satisfied the causation element of the offenses of assault with intent to kill while armed; assault with a dangerous weapon; or assault with significant injury while armed.

Except for the references to Mr. Watson and the location involved in the instant case and the references to serious injury and assault rather than to the death of the victim, the foregoing instruction was essentially identical to the UGB instruction given in *Fleming*. The en banc court in *Fleming* held that the instruction was erroneous because it "did not convey to the jury that a defendant normally cannot be held to have personally caused a death unless an action by the defendant is a but-for cause of the death, i.e., unless it is true that in the absence of the

defendant's action the death would not have occurred." *Parker v. United States*, 254 A.3d 1138, 1142 (D.C. 2021) (quoting *Fleming*, 224 A.3d at 217) (internal quotation marks omitted). "Requiring the defendant's conduct merely to have been a substantial factor in the victim's death is not remotely equivalent, we said, to the requirement of but-for causation." *Id.* (internal quotation marks omitted).

The parties agree that the UGB instruction in this case was erroneous for the same reason. Mr. Watson asserts in addition that instructing the jury that it could consider the UGB theory in considering the ADW and ASBIWA charges was error because the theory is applicable only in homicide cases. Mr. Watson and *amicus* also underscore that the UGB theory is a theory of causation, pertinent to who can be said to have caused a result that is an element of a crime, while ADW has no result element.[17] The government acknowledges that, heretofore, this court has discussed the UGB theory only in connection with homicide cases,[18] but cites cases

---

[17] *See White v. United States*, 207 A.3d 580, 588 (D.C. 2019) (explaining that simple assault "need not[] cause injury"); *Jenkins v. District of Columbia*, 223 A.3d 884, 897 (D.C. 2020) (For intent-to-frighten assault, "'factual proof that the victim actually experience[d] apprehension or fear' is not 'one of the essential elements' of the offense.").

[18] *See Roy v. United States*, 871 A.2d 498; *Bryant v. United States*, 148 A.3d 689 (D.C. 2016); *McCray v. United States*, 133 A.3d 205 (D.C. 2016).

from other jurisdictions in which courts have applied a similarly named theory in non-homicide cases[19] and argues that there is no reason why the UGB instruction on causation should be limited to homicide cases. The government contends that, in any event, any error in giving the UGB instruction was harmless.

We conclude that we need not decide in this case whether the UGB theory may have some application when a jury is considering ADW charges. The evidence pertinent to the ADW (intent to frighten) charge involving Mr. Salu and the ADW (attempted battery) charge involving Mr. Williams was that Mr. Watson personally pointed his gun at and shot at Mr. Salu and Mr. Williams.[20] We therefore see no reason to think the jury utilized the UGB "not necessary for the

---

[19] *See Reyes v. State*, 783 So. 2d 1129, 1133 (Fla. Dist. Ct. App 2001) ("[E]ach participant in a mutually-agreed-to gun battle in a public place may be held accountable for any death or injury to an innocent person which results from that confrontation[.]"); *State v. Garza*, 916 P.2d 9, 11 (Kan. 1996) (defendant who engaged in gun battle could be held criminally liable for acting in a reckless manner likely to result in injury or death to others where bystander was struck by opponent's bullet); *Platt v. State*, 778 S.E.2d 416, 423 (Ga. Ct. App. 2015) ("[A] defendant who was a party to the gun battle can be held criminally liable for a shooting injury or death caused by the battle, even if the shot was fired by an opponent of the defendant.").

[20] Ms. Quigley, Mr. Quigley, and Ms. Harris all testified that they saw Mr. Watson fire at Mr. Salu. In addition, and as pointed out by Detective Gargac, the video captured Mr. Watson shooting at Mr. Williams.

government to prove that the defendant personally fired the weapon" theory to find Mr. Watson guilty of the ADW offenses against Mr. Salu and Mr. Williams. We therefore agree with the government that the UGB instruction was harmless as to the ADW convictions.[21]

That brings us to ASBIWA. We begin our analysis by observing that we see no reason why some form of the UGB theory should not apply in resolving non-homicide charges involving a result element. We noted in the en banc opinion in *Fleming* that the causation principles the theory embodies are "generally applicable" rather than "special principles." *Fleming*, 224 A.3d at 228. The en banc court "in *Fleming* acknowledged these causation principles' application in second-degree-murder cases," *id.*, which we now note are similar to ASBI cases in that both offenses may be proven by evidence that the defendant caused serious injury to another through reckless action (i.e., in conscious disregard of the danger the action posed). *See White v. United States*, 692 A.2d 1365, 1368 (D.C. 1997) (noting that one who commits homicide by "act[ing] in conscious disregard of an

---

[21] *Cf. State v. Foreman*, No. 19-0878, 2021 Iowa App. LEXIS 51, at *30 (Iowa Ct. App. Jan. 21, 2021) (discerning no need to decide whether mutual combat theory instruction was appropriately given because the record and the verdicts "negat[ed] any plausible likelihood Foreman was found guilty based on the actions of anyone other than Foreman").

extreme risk of death or serious bodily injury" is guilty of second-degree murder); D.C. Code § 22-404(a)(2) (providing that a person commits ASBI if he "intentionally, knowingly, or recklessly causes significant bodily injury to another").[22] We are satisfied that on appropriate facts, the causation principles embodied in a properly worded UGB instruction may be applicable in ASBIWA cases. Thus, we may limit our further analysis to whether the error we identified in *Fleming* potentially had a prejudicial effect in this case, such that we "cannot say with fair assurance that the error did not have a substantial influence on the verdict." *Kotteakos v. United States*, 328 U.S. 750, 765 (1946); *Brooks v. United States*, 599 A.2d 1094, 1101-02 (D.C. 1991) (stating that instructional error generally is subject to harmless error analysis under *Kotteakos*).[23]

---

[22] *See also Flores v. United States*, 37 A.3d 866, 869 (D.C. 2011) (finding no plain error in instruction that the recklessness required for ASBIWA "need not be specifically directed at the injured party").

[23] Mr. Watson argues that the evidence was insufficient to sustain the ASBIWA conviction even under an appropriately worded UGB instruction. Specifically, emphasizing that "it was undisputed that [Mr.] Williams fired the shot that injured [Jeremiah], while there was no evidence that the bullet that injured [him] came from appellant's gun," appellant contends that there was no evidence that would have permitted the jury to find that he was the but-for cause of Jeremiah's injuries. That is a correct description of the evidence, but we disagree that the evidence was insufficient for conviction under a but-for theory of causation and under a proximate cause analysis. The fact that the jury rejected appellant's self-defense claims is an indication that jurors found that Mr. Watson provoked the shoot-out, and signals, we think, that jurors might have agreed that Mr. Watson's conduct was a but-for cause of the ASBIWA against Jeremiah. The

(continued…)

It seems likely that the jury did rely on the UGB "not necessary for the government to prove that the defendant personally fired the weapon" theory in finding appellant guilty of ASBIWA against young Jeremiah. Unlike the evidence supporting the ADW convictions, the ballistics and other evidence pertinent to the ASBIWA conviction made it likely that the (.38 caliber) bullets that were fired and that injured Jeremiah were fired from the gun of Mr. Williams, not from appellant's gun. And, although the prosecutor told the jury in closing that "if [Mr. Watson] would have stayed by that car, . . . none of those people would have been put at risk" — essentially urging jurors to apply a but-for test — the prosecutor's opening statement emphasized that the evidence would show that appellant was a

---

(…continued)
law would have permitted them to hold Mr. Watson responsible on that basis. *Cf. Fleming*, 224 A.3d at 229 (approving instruction that "[a] defendant who does not personally cause death may in some circumstances nevertheless be held criminally responsible for the death"); *see also id.* at 225 (rejecting the argument that "one cannot properly be treated as having proximately caused a result if the chain of events leading to the result includes the subsequent voluntary action of another"); *id.* at 224 ("A criminal defendant proximately causes, and thus can be held criminally accountable for, all harms that are reasonably foreseeable consequences of his or her actions." (quoting *Blaize v. United States*, 21 A.3d 78, 81 (D.C. 2011) (internal quotation marks omitted))). The proximate cause requirement counters what *amicus* decries as a "sweeping scope of liability" based on the UGB instruction.

"substantial factor" in causing Jeremiah's injury.[24]   Appellant's trial counsel countered that a shooting would have occurred in any event, urging the jury to find that "there was going to be a shooting that day no matter what," even if appellant had not armed himself and drawn his gun, because Mr. Williams was brought to the scene by Mr. Salu for the specific purpose of killing appellant.   But in light of the trial court's "substantial factor" instruction and the prosecutor's statements anticipating that instruction, we are unable to conclude that the failure to give the jury a but-for instruction was innocuous.  We conclude that appellant has shown "a

---

[24] The prosecutor told the jury:

> [I]f you engage in a shootout, in a gun battle, if you show up physically armed and mentally ready to engage in that gun battle, you actually do it -- you engage in the gun battle -- if your actions are a *substantial factor* in someone's injuries and it's reasonably foreseeable that someone could be seriously hurt or die based on your actions, then you are just as responsible for those injuries as if -- even if somebody else caused them. So, in other words, if someone gets hurt when three people are shooting, all three people are responsible. (emphasis added)

Mr. Watson also argues that one of the prosecutors erroneously told jurors that they could rely on the UGB theory to find that Mr. Watson acted with the requisite intent.  It appears that the prosecutor was addressing the AWIKWA charges with respect to Messrs. Salu, Williams and Quigley and the minor children Jeremiah and Jaidyn, which required the jury to find that Mr. Watson acted with an intent to kill in order to return a guilty verdict.  As noted, the jury acquitted Mr. Watson of the AWIKWA charges, so the prosecutor's remark was harmless as to those charges.

reasonable probability of a more favorable outcome if the jury had been instructed properly." *Parker*, 254 A.3d at 1145; *see also Fleming*, 224 A.3d at 223. Accordingly, we must reverse his ASBIWA conviction.

**V.**

We now turn to Mr. Watson's and amicus's arguments focused on the doctrine of concurrent intent.[25] The trial court gave the jury the following instruction on concurrent intent:

---

[25] The doctrine of concurrent intent applies "when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity." *Ford v. State*, 625 A.2d 984, 1000 (Md. 1993); *see also Ruffin v. United States*, 642 A.2d 1288, 1298 (D.C. 1994) ("[W]here the means employed to commit the crime against a primary victim created a zone of harm around that victim, the fact-finder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone.'").

We note that the trial court, in response to a jury note, instructed jurors that the concurrent-intent instruction did not apply to intent-to-frighten ADW. We assume that the jury followed that instruction. *See Tann v. United States*, 127 A.3d 400, 459 (D.C. 2015).

> I further instruct you that if the government proves beyond a reasonable doubt that Mr. Watson, by firing multiple shots, created a zone of harm or danger around Saheed Salu or Kevin Williams with the intent to kill, injure, or harm either of them, you may infer that Mr. Watson intended to kill, injure, or harm any other person in the anticipated zone of harm or danger; and that Mr. Watson has committed the same type of assault against Jeremiah White, Jamal Quigley, or Jaidyn Turner that he committed against Saheed Salu or Kevin Williams and he would have committed had he also injured or harmed Saheed Salu or Kevin Williams. This principle applies whether or not the intended victim is also injured or harmed or whether or not the intended victim is identified. That's concurrent intent.

The court told the jury that the instruction was applicable to the charges of AWIKWA, ASBIWA, and ADW (attempted battery), but not to ADW (intent-to-frighten). The jury acquitted Mr. Watson of AWIKWA, and we have already determined that the ASBIWA conviction must be reversed because of the erroneous UGB instruction.[26] Thus, the issue before us is whether the court erred prejudicially in giving the instruction as to ADW (attempted battery) against Mr.

---

[26] A person commits ASBI if he "*intentionally*, knowingly, or recklessly causes significant bodily injury to another." D.C. Code § 22- 404(a)(2) (emphasis added); *Belt v. United States*, 149 A.3d 1048, 1054 (D.C. 2016). Thus, on certain facts, concurrent-intent may support a defendant's ASBIWA conviction. But in this case, the ballistics evidence and the evidence of the government's acknowledgment during Mr. Williams's plea proceeding were overwhelming evidence that Jeremiah was injured by bullets from Mr. Williams's gun. It therefore is highly unlikely that the jury found Mr. Watson guilty of ASBIWA against Jeremiah based on concurrent intent (or would do so upon any retrial).

Williams. Our analysis need not be lengthy (and because our analysis is limited, we decline *amicus*'s invitation to re-examine the doctrine of concurrent intent in this case).

We may assume without deciding that, as appellant argues, it was error to give a concurrent-intent instruction as to ADW (attempted battery) because it is a general intent crime.[27] We may do so because, we conclude, any error was harmless. There is no dispute that Mr. Watson fired directly at Mr. Williams and, in light of what the surveillance video showed about where each shooter was located, the jury had no basis for finding an attempted battery against Mr. Williams based on his having been in a zone of danger created while Mr. Watson was firing at someone else.[28]

**VI.**

---

[27] *See Smith v. United States*, 593 A.2d 205, 207 (D.C. 1991) (internal quotation marks omitted) (The intent element of simple assault is merely "the general intent to perform the acts which constitute the assault"); *Vines v. United States*, 70 A.3d 1170, 1179 (D.C. 2013) (same).

[28] The video evidence was that appellant shot in a westerly direction toward Mr. Williams and away from Mr. Salu.

Mr. Watson argues that there was insufficient evidence to support his convictions of ASBIWA and ADW (and thus also insufficient evidence to support the associated PFCV convictions). For the reasons discussed in section II, we accept that the evidence was insufficient to support the ADW (intent to frighten) convictions relating to Mr. Quigley and the minor children. For the reasons discussed in section IV above, the evidence was sufficient to support the ASBIWA conviction under the but-for and proximate causation theories discussed in the en banc decision in *Fleming*. And, as already discussed, the evidence was also sufficient to show appellant forfeited his right to self-defense by provoking the shootout. We now briefly discuss the sufficiency of the evidence to support the remaining ADW convictions (ADW against Mr. Williams under both attempted battery and intent-to-frighten theories, and intent-to-frighten ADW against Mr. Salu).[29]

---

[29] "When reviewing for sufficiency of the evidence, we consider the evidence in the light most favorable to the government." *Vines*, 70 A.3d at 1179. "We draw all inferences in favor of the prosecution, so long as they are supportable under any view of the evidence." *Id.* "The evidence at trial need not conclusively establish guilt to sustain a conviction[;] [r]ather, it is sufficient that a reasonable juror could have concluded that the evidence established the defendant's guilt beyond reasonable doubt." *Id.* "[C]ircumstantial evidence may be more

(continued…)

To prove attempted-battery assault, the evidence must show "an attempt or effort, with force or violence, to do injury to the person of another," the "apparent present ability to carry out such an attempt or effort," and "a general intent to do the act or acts constituting the assault." *Contreras v. United States*, 121 A.3d 1271, 1275 (D.C. 2015) (quoting *Moore v. United States*, 599 A.2d 1381, 1383 (D.C. 1991)). To obtain a conviction for ADW, the government must prove beyond a reasonable doubt the "three elements of simple assault, plus the use of a dangerous weapon." *Vines*, 70 A.3d at 1180. As noted above, to prove intent-to-frighten assault, the evidence must show "the defendant intended either to cause injury or to create apprehension in the victim by engaging in some threatening conduct." *Snowden*, 52 A.3d at 868 (quoting *Robinson*, 506 A.2d at 574).

In this case, the evidence, viewed in the light most favorable to sustaining the convictions, was that Mr. Watson gestured to show he had a gun or pulled out

---

(…continued)
compelling than direct testimony." *Mitchell v. United States*, 64 A.3d 154, 157 (D.C. 2013).

the gun while confronting Mr. Salu,[30] and that Mr. Watson thereafter raised the gun in Mr. Williams's direction while lunging at him, triggering a shoot-out in which Mr. Watson shot at Mr. Williams and then at Mr. Salu. Thus, the evidence was sufficient to prove the ADW charges relating to Mr. Williams and Mr. Salu. *See, e.g.*, *Jenkins v. District of Columbia*, 223 A.3d 884, 897 (D.C. 2020) ("[S]imply holding a weapon before another person in a threatening manner can constitute intent-to-frighten assault[.]"); *Snowden*, 52 A.3d at 868-69 ("[I]ntent to frighten assault includes situations in which a weapon is used in any manner that would reasonably justify the other person in believing that the weapon might immediately be used against him.") (quoting *Parks v. United States*, 627 A.2d 1, 7 (D.C. 1993) (internal quotation marks omitted)); *Ruffin*, 642 A.2d at 1296 (concluding that evidence was sufficient to support ADW conviction where defendant "unloos[ed] a hail of gunfire at the vehicle" in which victims were sitting).

**VII.**

---

[30] *Amicus* argues that these actions, if they occurred, were only preparatory, and that there was no concurrence between any *mens rea* related to them and the shooting that occurred later. But we are satisfied these actions were elements of the *actus reus* of intent-to-frighten assault.

Finally, appellant argues that his several convictions of ADW and PFCV must merge.[31] As explained in section II above, we conclude that Mr. Watson's multiple convictions of intent-to-frighten ADW do merge. However, Mr. Watson's conviction for ADW (intent to frighten) against Mr. Salu and his conviction of attempted battery assault against Mr. Williams do not merge. The relevant principle is that "where individuals in a group are targets of particularized threats of force, the assailant has committed successive assaultive acts." *Snowden*, 52 A.3d at 873. Here, the evidence showed, and the jury apparently found, that Mr. Watson pointed his gun at and shot at Mr. Williams and threatened Mr. Salu with his firearm, targeting them individually.

"In general, when the convictions for the predicate crimes do not merge, the associated PFCV convictions do not merge either." *Taylor v. United States*, 138 A.3d 1171, 1180 (D.C. 2016) (internal alteration, quotation marks and citation omitted). Moreover, with respect to Mr. Watson's assaultive actions targeted at Mr. Salu and Mr. Williams, he "was able to desist from violence against [the other] victim, but chose not to do so." *Campos-Alvarez v. United States*, 16 A.3d 954,

---

[31] "We review issues of merger de novo. *See Mobley*, 101 A.3d at 419 (quoting *Nixon v. United States*, 730 A.2d 145, 151-52 (D.C. 1999))."

963 (D.C. 2011) (internal quotation marks and footnote omitted); *see Taylor*, 138 A.3d at 1180-81 ("This court has adopted the 'fresh impulse' or 'fork-in-the-road' test: . . . [E]ach time the [appellant] commits an independent violent crime, a separate decision is made whether or not to possess the firearm during that crime, thereby exposing the [appellant] to a separate, additional conviction of PFCV.") (brackets omitted).  Accordingly, Mr. Watson's PFCV convictions associated with his ADW convictions against Mr. Salu and Mr. Williams do not merge.

* *

For the foregoing reasons, we reverse Mr. Watson's conviction of ASBIWA and the related PFCV conviction.  We also vacate the intent-to-frighten ADW convictions as to Mr. Quigley, Jeremiah White, and Jaidyn Turner and the related PFCV convictions.  We affirm the remaining two ADW convictions, the two related PFCV convictions, and the FIP conviction.

*So ordered.*